Jesus A. MEDINA a/k/a Juan Bermudez-Valencia, Alvaro Montano a/k/a Wilson Quinones-Olaya by and through his next friend Franklin Montano, Plaintiffs,

v.

Paul B. O'NEILL, Individually and as District Director of the Immigration and Naturalization Services of the Department of Justice, Carl Jensen, Individually and in his capacity as Immigration and Naturalization Investigator, Immigration and Naturalization Service of the Department of Justice, E.S. Bennings Company, and Danner, Inc., Defendants, and Third-Party-Plaintiffs,

v.

FLOTA MERCANTE GRANCOLOMBIANA, S.A., Third-Party-Defendant.

Maria DEL GARCIA, Mother and Next Friend of Ramon Garcia, Plaintiff,

v.

Paul B. O'NEILL, et al., Defendants.

Civ. A. Nos. H–81–2928, H–81–3242.

United States District Court,
S.D. Texas,
Houston Division.

May 7, 1984.

Stefan Presser, American Civil Liberties Union, Houston, Tex., for plaintiffs.

Thomas B. Greene, III, Crain, Caton, James & Womble, Houston, Tex., for third party defendant Flota Mercante Grancolombiana S.A.

Robert G. Taylor, II, Boswell, O'Toole, Davis & Pickering, Michael K. Suarez, Asst. U.S. Atty., Houston, Tex., Bradley A.

Jackson, Royston, Rayzor, Vickery & Williams, Houston, Tex., for defendants.

## MEMORANDUM AND ORDER

SINGLETON, Chief Judge.

Plaintiffs in the above-styled consolidated action bring this suit against defendants alleging violations of 8 U.S.C. §§ 1223, 1323(d) (1976) and the fourth and fifth amendments of the United States Constitution. Presently before this court are plaintiffs' motion for partial summary judgment against all the federal defendants and defendants' motion to dismiss.

## BACKGROUND

The court finds that the following are the essential, undisputed facts:

(1) During the first week of February 1981, the vessel Cartagena De Indios entered the Port of Houston. Prior to docking, the ship's captain notified his shipping agent, E.S. Bennings Company ("Bennings"), in Houston that twenty-six stowaways had been discovered on board. The agent immediately alerted the Immigration and Naturalization Service ("INS") and requested its help detaining these individuals.[1]

(2) It is not contested that stowaways are excludable aliens. In the run-of-the-mill case, a stowaway is automatically excluded, and is not entitled to a hearing. The carrier is usually ordered to detain the stowaway on board the vessel for immediate transport out of the United States.[2] This situation, however, involved an unusually large number of stowaways.[3] The ship lacked any facilities suitable for deten-

---

1. Because of the large number of stowaways, the ship could not continue to hold them for the remainder of the voyage. It was also difficult to find any one place on shore to detain them. The closest INS facility to the Port of Houston is Port Isabell, Texas. INS has a contract agreement with local facilities for temporary detention, however, none could accomodate that many aliens.

2. INS criminal investigators assigned to the anti-smuggling unit were sent to meet the Cartagena De Indio while it was anchored in Galves-

ton. These INS agents inspected and interviewed the aliens, and then completed the necessary paper work. Because they are automatically excludable without a hearing, the stowaways were ready to be shipped out of the country once this limited process was concluded.

3. Deposition testimony established that the usual number of stowaways varies between one and two, and the highest range from five to seven.

tion on board,[4] and the large number of stowaways presented a danger to the crew because it was feared they might attempt to take over the ship. Therefore, Paul O'Neill, District Director of the INS, granted the carrier permission to detain temporarily the stowaways off the vessel.[5]

4. The deposition testimony establishes that the ship had no spare quarters or holding cells for detention. Instead, the stowaways were locked in several storage holds located in various parts of the ship. The storage holds, not having been designed for human habitation, lacked such necessities such as ventilation, heating, lighting, bedding, toilet facilities, and running water. Many of the stowaways lacked the proper clothing for February weather, for example shirts and jackets. They stuffed newspaper in their clothes to warm themselves.

5. It is unclear exactly who had formal custody of the aliens. Deposition testimony establishes that the stowaways could not have been removed from the vessel without authorization from the INS. Mr. Jose Diaz was the INS Inspector who supervised the inspection and examination of the stowaways on board the vessel and filled out the relevant immigration forms. Mr. Diaz filled out the forms, ordering the Captain to detain the stowaways on board. He testified that he knew that INS, specifically Mr. O'Neill, had determined that the aliens could be removed from the ship, but says he did not give the order to the Captain and assumed someone else had.

   Mr. O'Neill's deposition testimony states that before the investigators went out to the ship, he was advised of the large number of stowaways and determined that they could be detained off the vessel. Mr. O'Neill further states that the off-board detention was on condition that the carrier assume responsibility for their custody. Mr. O'Neill testified that, although the paperwork generated indicated that the stowaways were to be detained on board, Mr. Diaz gave the Captain oral authorization to remove them temporarily. The deposition testimony of Carl Jensen, INS Supervisory Criminal Investigator, and Billy Burkland, INS Criminal Investigator, establishes that the Galena Park Police Department agreed to accept custody of some aliens overnight as a favor to INS. Mr. Jensen also was responsible for ordering the stowaways' release from Galena Park to the custody of Bennings or Danner, Inc. ("Danner").

   Because of the unusual nature of this situation, it is unclear to this court, and evidently to the people involved, whether all the stowaways were released to the custody of the agent, E.S. Bennings, or whether twenty aliens were in INS custody, ten of whom remained at the Galena Park Jail and ten of whom were later released to Danner's custody. However, it is not materi-

(3) Mr. O'Neill agreed to have INS contact some local facilities in an effort to find a place for detention. The Galena Park Police Department agreed to hold some of the aliens temporarily [6]. The remaining aliens were placed at the Danner, Inc. ("Danner") facility.[7] After two days of deten-

al to this court's decision whether the shipping agent was in custody of all twenty-six, sixteen or only six of the stowaways.

6. James Maxcey, President of Danner testified that the Bennings agent informed him that arrangements had been made for twenty aliens to be held at Galena Park; the remaining six were to be held at Danner's facility. It appears that Galena Park did originally detain twenty aliens for one day. After receiving calls from the Galena Park facility the next day Carl Jensen, Danner security guards, and a Bennings agent met at that facility. Danner received custody of ten more aliens because the Galena Park jail was overcrowded.

7. Danner is a private security firm that does contract work for shipping agents in the Port of Houston. Danner has an office at 1201 Kellog Street in Houston.

   The deposition testimony of James Maxcey establishes that Danner's primary function was to provide transportation for crew members and spare parts. As a less significant part of their operation, Danner provides the ships with security watchmen. It is only during the last four or five years that Danner has detained aliens at their office, although Danner has taken physical custody of aliens to transport them for the shipping agents for many years.

   Danner maintains two cells at its office location for temporary detention purposes. One cell, which is approximately twelve feet by twelve feet, is designed to hold two people, while the other cell, which is approximately twelve feet by twenty feet, is designed to hold six. Each is equipped with a wash basin, toilet, bunk beds, table and chairs. The larger cell also has a sofa that converts into a double bed.

   Deposition testimony indicates that all sixteen stowaways held at the Danner facility were kept together in the cell designed to hold six. Mr. Maxcey testified that the aliens preferred to stay together; nonetheless, Danner's facilities are intended to hold no more than eight individuals overnight, two in one cell and six in the other cell. Mr. Maxcey testified that the detainees were issued any clothing they may have lacked, were issued bedding, were allowed to take a shower, and were fed three meals per day. No recreation or exercise was provided during their detention. At least ten aliens did not have a bed to sleep on because the cell had two bunk beds (a total of four beds) and a fold-out couch that could sleep two.

tion, while the guard on duty was taking a telephone call, the aliens attempted to escape. By the time Danner's guards got the situation under control, one alien was killed accidentally and another was wounded.[8] The Houston Police Department was called in and ultimately assumed custody of the aliens.

In their motion for partial summary judgment, plaintiffs allege both constitutional and statutory violations against the INS. First, plaintiffs assert that the INS failed to oversee their detention. Because of this failure, plaintiffs contend they were subjected to conditions of detention which amounted to punishment, and as a consequence were deprived of their fifth amendment due process rights. Second, plaintiffs contend that the failure to designate a place of detention while their exclusion was pending deprived the stowaways of rights secured by the Immigration and Nationality Act of 1952, 8 U.S.C. § 1323(d) (1976) ("the Act").

In opposition to plaintiffs' motion, defendants counter that the plaintiffs at all times remained in the custody of the carrier FLOATA MERCANTE GRANCOLOMBIANA and its agent Bennings, not the INS. Further, defendants urge that the carrier hired Danner to detain the stowaways without INS knowledge or approval. Therefore, defendants contend that plaintiffs have not alleged a constitutional claim because the carrier's and Danner's acts were not attributable to the INS. In addition, defendants challenge plaintiffs statutory claims stating that the Act's provisions do not require the INS to designate a place of detention and that Congress' did not intend to imply a cause of action under 8 U.S.C. § 1323 for stowaways. Finally, defendants aver that the doctrine of qualified immunity shields the good faith acts of the individually named federal defendants because their conduct did not violate clearly established statutory or constitutional rights. Therefore, defendants aver that plaintiffs are not entitled to partial summary judgment and defendants also urge this court to grant their motion to dismiss for failure to state a claim for relief.

Initially, this court will discuss the scope of judicial review, subject-matter jurisdiction, and sovereign immunity. Then the court will consider plaintiffs' statutory and constitutional claims.

## I. SCOPE OF JUDICIAL REVIEW, JURISDICTION, AND SOVEREIGN IMMUNITY

At the outset, this court notes the limited scope of judicial review in immigration matters. The Supreme Court has stated repeatedly that Congress' legislative powers over the admission and exclusion of aliens is plenary. *See, e.g., Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 1477, 52 L.Ed.2d 50 (1977); *Kleindienst v. Mandel,* 408 U.S. 753, 765–67, 92 S.Ct. 2576, 2582–84, 33 L.Ed.2d 683 (1972). As early as 1895, the Court held that

> "[t]he power of Congress to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy in that regard enforced exclusively through executive officers, without judicial intervention, is settled by our previous adjudications."

*Lem Moon Sing v. United States,* 158 U.S. 538, 547, 15 S.Ct. 967, 970, 39 L.Ed. 1082 (1895).

Indeed, the Court has gone so far as to find that "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 212, 73 S.Ct. 625, 629, 97

---

**8.** Mr. Maxcey testified that most of its employees are issued weapons (shotguns). He also testified that Danner has no written policy as to how often the security of its detention cells is to be checked; Danner does not drill its employees for emergencies such as by fire or attempted escape. Danner shows their employees how to operate the guns issued, but does not train them on their use, test them for knowledge of correct handling or proficiency in firing the weapons. Danner facilities were not inspected or regulated by the INS.

L.Ed. 956 (1953);[9] *United States ex rel. Knauff v. Shaughnessy,* 338 U.S. 537, 544, 70 S.Ct. 309, 94 L.Ed. 317 (1950); *In re Cahill,* 447 F.2d 1343, 1344 (2d Cir.1971). Notwithstanding Congress' broad powers, the Constitution establishes a floor of rights to be afforded to any person found within United States territory. Therefore, the Supreme Court has mandated continuously that all persons, whether citizens or aliens, are entitled to the fifth and fourteenth amendments' protection against deprivations of life, liberty, and property without due process of law. *Mathews v. Diaz,* 426 U.S. 67, 77, 96 S.Ct. 1883, 1890, 48 L.Ed.2d 478 (1976); *Wong Wing v. United States,* 163 U.S. 228, 238, 16 S.Ct. 977, 981, 41 L.Ed. 140 (1895); *Yick Wo v. Hopkins,* 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 30 L.Ed. 220 (1886). These protections apply to all aliens whether seeking entry at the border or in the interior, either legally or illegally. *United States v. Henry,* 604 F.2d 908, 914 (5th Cir.1979); *accord Rodriguez-Fernandez v. Wilkinson,* 654 F.2d 1382, 1387 n. 3 (10th Cir.1981).[10]

Plaintiffs appear before this court with claims of statutory and due process violations, asserting that defendants ordered but failed to adequately supervise their detention. As a result, they claim they were subjected to conditions amounting to punishment in violation of the fifth amendment. Not contesting their ultimate exclusion or the procedure Congress provided to assure their exclusion, plaintiffs challenge the INS procedure whereby they may be detained by private parties in unregulated detention facilities which do not meet due process standards. Accordingly, this court must ascertain the parameters of the statutory procedures Congress has provided for in the Act and, within those procedures, ascertain what due process rights were afforded the plaintiffs. The court must then review the agency's actions to assure that the plaintiffs were afforded the process Congress provided.

In a footnote, defendants assert that this court lacks *Bivens* -type subject matter jurisdiction over these claims. Plaintiffs contend that jurisdiction exists directly under the fifth amendment. Defendants do not dispute that private litigants are entitled to enforce the Constitution's guarantees against arbitrary deprivations of fourth, fifth, and eighth amendment rights, *see Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1970); *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979); *Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980), but assert that jurisdiction is lacking because (1) the alleged tort was not intentional, (2) special factors preclude the cause of action, and (3) an alternative ave-

**9.** *But see Rodriguez-Fernandez,* 654 F.2d at 1388 wherein the court distinguishes *Mezei* finding that:

the primary focus of Mezei was upon the excluded alien's right to a due process hearing concerning his right of reentry into this country. Also, he was excluded as a security risk and the Korean War was in progress. Security risks and enemy aliens during wartime have always been treated specially. The conditions of Mezei's confinement on Ellis Island do not appear comparable to Rodriguez-Fernandez' imprisonment in two maximum security prisons. In *Mezei* there were continuing efforts to deport. Twice the alien was shipped out to other countries which refused to permit him to land; he applied for entry to other countries and thereafter voluntarily terminated his efforts to find a new home. His petition for relief sought not only release from confinement but also admission to the United States.

Even with these special facts *Mezei* has been criticized as the nadir of the law with which the opinion dealt. *See Hart, The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic,* 66 Harv.L.Rev. 1362, 1387–1396 (1953). In more recent cases, the Supreme Court has expanded the constitutional protections owed alien apart from the right to enter or stay in this country. *See, e.g., Hampton v. Mow Sun Wong,* 426 U.S. 88, 96, 96 S.Ct. 1895, 1902, 48 L.Ed.2d 495 (1976); *Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971).

**10.** The Court has not concluded however, that every alien is entitled to enjoy all the advantage of citizenship or that all aliens must be placed in a single homogenious classification. *Mathews,* 426 U.S. at 78–79 and n. 12, 96 S.Ct. at 1890–1891 n. 12.

nue—habeas corpus—was conceivably available to remedy the allegedly unconstitutional detention. Defendants reserved these arguments because they are "novel and complex" and instead briefed their qualified immunity defense.

Lack of subject matter jurisdiction is not waivable and may be asserted at any time, thus there is no need to reserve the arguments. F.R.C.P. 12(h)(3). Even without the benefit of briefing, it is apparent that these "novel and complex" arguments are without merit. The Supreme Court found that *Bivens*-type constitutional torts are within the federal courts' "arising under" jurisdiction. *Biven*, 403 U.S. at 392–5, 91 S.Ct. at 2002–4. Nowhere did the court condition jurisdiction on a finding of intentional conduct. *Id.* The question of intent, if relevant at all, would be considered either when assessing the plaintiffs' claims on the merits, when reviewing defendants qualified immunity defense, or when determining damages. But, any lack of willfulness cannot be grounds to deny the court subject matter jurisdiction.

Furthermore, it is doubtful whether habeas corpus relief was available. The immigration statutes do not provide for habeas corpus relief for excludable aliens, 8 U.S.C. § 1225, although it is available for deportable aliens, *id.* § 1252(a). The courts have been willing to grant habeas relief pursuant to 28 U.S.C. § 2241(a), (c) for excludable aliens unlawfully held in federal custody. *See, e.g., Gilroy v. Ferro*, 534 F.Supp. 321 (W.D.N.Y.1982). Although habeas relief was "conceivably available" during the two days plaintiffs were detained pursuant to INS orders, it was unavailable when this suit was filed because plaintiffs were no longer in custody, *id.* at 322 n. 1, and already had been sent back to Colombia. That habeas relief might have been available is not sufficient to deny this court subject matter jurisdiction.

Therefore, pursuant to Supreme °Court precedent, this court finds that it has jurisdiction under 28 U.S.C. § 1331(a) to consider plaintiffs' fifth amendment claims against the federal defendants. *See Bi-*

*vens*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619; *Stokes v. United States, INS*, 393 F.Supp. 24, 28 (S.D.N.Y.1975); *see also Louis v. Nelson*, 711 F.2d 1455, 1483–85 (11th Cir.1983); *Haitian Refugee Center v. Smith*, 676 F.2d 1023, 1033 (5th Cir.1982). For plaintiffs to recover in this *Bivens* type action, they must establish that: (1) plaintiffs' own constitutionally protected rights were involved; (2) defendants' conduct violated their rights; (3) plaintiffs have no effective means other than the judiciary to enforce those rights; and (4) no congressional declaration denies recovery nor do special factors counsel hesitation. *Davis*, 442 U.S. at 242–48, 99 S.Ct. at 2275–78; *Bivens*, 403 U.S. at 392–97, 91 S.Ct. at 2002–05. Plaintiffs challenge infringement of their own rights to life and liberty. This court has not concluded that Congress has created any other remedial-scheme equally effective to a *Bivens*-type action. *See Carlson*, 446 U.S. at 23, 100 S.Ct. at 1474. Defendants urge, however, that special factors preclude this cause of action. Because this suit is styled against the INS and federal officers, in their official 'capacities and as individuals, and both monetary and declaratory relief is requested, this court will assess *sua sponte* whether eleventh amendment sovereign immunity bars any of plaintiffs' claims for relief.

■ The eleventh amendment prohibits suits against the United States unless Congress has consented to suit. U.S.Const. amend. XI. Congress vested the district court with jurisdiction for all suits arising under the immigration laws, 8 U.S.C. § 1329, and this provision may operate as a waiver of immunity for the alleged statutory violations. Under *Bivens,* this court implies a cause of action directly under the fifth amendment of the Constitution and is vested with § 1331(a) jurisdiction. Nevertheless, § 1331(a) is not a waiver of sovereign immunity. Congress enacted such a waiver in the 1976 amendment to the Administrative Procedure Act, which provides that,

[a] person suffering legal wrong because of agency action, or adversely affected

or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party....

5 U.S.C. § 702 (1976).

Interpreting § 702, the fifth circuit found that it "waives sovereign immunity for actions against federal government agencies, seeking nonmonetary relief, if the agency conduct is otherwise subject to judicial review." *Sheehan v. Army and Air Force Exchange Service*, 619 F.2d 1132, 1138–39 (5th Cir.1980), *rev'd on other grounds*, 456 U.S. 728, 102 S.Ct. 2118, 72 L.Ed.2d 520 (1982); *accord Jaffee v. United States*, 592 F.2d 712, 718–19 (3d Cir.), *cert. denied*, 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979); *Beller v. Middendorf*, 632 F.2d 788, 796–99 (9th Cir.1980), *cert. denied*, 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1981). *But see Watson v. Blumenthal*, 586 F.2d 925, 932 (2d Cir.1978). The INS is an agency within the meaning of the APA, *see* 5 U.S.C. § 701(b)(1), O'Neill and Jensen are employees of that agency, and the court has jurisdiction under § 1331. Accordingly, pursuant to § 702, plaintiffs' request for declaratory relief against the federal defendants is not barred by the eleventh amendment.

Plaintiffs, however, have also requested damages. Section 702 does not waive sovereign immunity in suits for money damages. 5 U.S.C. § 702; *see Jaffee*,

592 F.2d at 719. The Supreme Court has firmly established that sovereign immunity poses no bar for damage actions against federal officers sued as individuals because a judgment will not affect the government's operations or property. *Larson v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682, 687, 69 S.Ct. 1457, 1460, 93 L.Ed. 1628 (1948); *see Davis*, 442 U.S. at 245–48, 99 S.Ct. at 2277–78; *Bivens*, 403 U.S. at 395–97, 91 S.Ct. at 2004–05. The eleventh amendment, therefore, poses no bar for plaintiffs' damage claims against O'Neill and Jensen as individuals. However, any money judgment against the INS or these agents in their official capacity would be, in effect, one against the United States because it would require expenditure from the public treasury; as a consequence, sovereign immunity bars the claims for monetary relief against them. *Larson*, 337 U.S. at 691 n. 11, 69 S.Ct. at 1462 n. 11; *Carter v. Seamans*, 411 F.2d 767, 770 (5th Cir.1969), *cert. denied*, 397 U.S. 941, 90 S.Ct. 953, 25 L.Ed.2d 121 (1970); *see* 5 U.S.C. § 702 (1976).

It is now incumbent upon this court to determine whether defendants' actions violated plaintiffs statutory or constitutional rights. The court will examine the statutory scheme and then will determine whether a right of action may be implied under § 1323.

## II. THE STATUTORY SCHEME AND LEGISLATIVE HISTORY

Plaintiffs urge this court to imply a statutory right of action under 8 U.S.C. § 1323(d),[11] asserting that Congress conferred on stowaways the "benefit" of being detained at an INS designated facility. INS ordered their detention but failed to

---

**11.** 8 U.S.C. § 1323(d) provides in pertinent part: The owner, charterer, agent ... of any vessel ... arriving in the United States from any place outside thereof who fails to detain on board or at such other place as may be designated by an immigration officer any alien stowaway until such stowaway has been inspected by an immigration officer, or who fails to detain such stowaway on board or at such other designated place after inspection if ordered to do so by an immigration officer, or who fails to deport such stowaway on the vessel ... on which he arrived or on another vessel ... at the expense of the vessel ... on which he arrived when required to do so by an immigration officer, shall pay to the collector of customs ... $1000 for each alien stowaway, in respect of whom any such failure occurs.

designate a place of detention; plaintiffs contend that § 1323 requires designation. Defendants counter that § 1323 does not require INS to designate a place of detention. Furthermore, they contend that the court should not imply a right of action for plaintiffs because they do not satisfy the requisites enunciated in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1973)[12]. This court agrees that a right of action should not be implied.

The Immigration and Nationality Act of 1952 ("the Act") establishes general classes of excludable aliens. 8 U.S.C. § 1182. Stowaways are among those excluded. *Id.* § 1182(a)(18). The statutes require INS agents to examine and inspect all aliens, including stowaways, seeking entry into the United States, and empowers the agent to determine whether the alien is one excludable pursuant to § 1182. *Id.* § 1225(a). Examination and inspection may be conducted either on board the vessel, *id.,* or elsewhere at a designated time and place. *Id.* § 1223. Stowaways, however, are not entitled to a hearing before a special inquiry officer, *id.* §§ 1225(b), 1226(a), 1323(d); instead, they are automatically excludable once identified as a stowaway. *Id.* § 1227(a)(1). All expenses for detention of excludable aliens either before or after examination and inspection as well as the costs of transporting excluded aliens back to the countries from which they came are to be borne by the owner of the vessel on which the aliens arrived. *Id.* § 1227(c). Furthermore, Congress makes it unlawful for the carriers[13] to bring aliens into the country without a proper visa. *Id.* § 1323(a). Carriers who violate the statute will be assessed a fine, and the vessels will not be granted clearance until either the fine is paid or a bond is posted. *Id.* § 1323(b), (d). In the case of stowaways, the carrier's failure to detain or to deport in accordance with INS instructions also will subject them to a fine. *Id.* § 1323(d).

The legislative history behind the Act unequivocally establishes that Congress intended to assure that "undesirable aliens" would not gain admission into this country. 1952 U.S.Code Cong. & Ad.News 1653, 1698. As one means to accomplish its goal, Congress eliminated the Attorney General's discretionary authority to admit stowaways and instead excluded all stowaways absolutely. *Id.* at 1703. Congress intentionally afforded stowaways less protection when it denied them any hearing before a special inquiry officer. *Id.* at 1710.[14]

To deter carriers from transporting excludable aliens into the country, Congress originally imposed heavy fines on those who violated the immigration laws. *Id.* at 1721. Subsequently, Congress implemented the visa system and gave the consular offices primary responsibility for screening aliens. *Id.* In the Act of 1952, carriers who relied on visas issued by the consular were not required to pay fines. *Id.* Nonetheless, Congress imposed heavy fines on carriers in all other cases and maintained that carriers should bear all the expenses incident to detention and deportation of excludable aliens they transported into this country. *Id.*

**12.** In *Cort v. Ash,* the Supreme Court articulated four relevant factors in determining whether to imply a private remedy in a statute not expressly providing one:

First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted,"—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?
*Id.* at 78, 95 S.Ct. at 2087 (citations omitted, emphasis theirs).

**13.** Throughout this discussion, the court's use of the term carrier refers to any transportation company, owner, master, commanding officer, agent, charterer or consignee of any vessel. *See, e.g.,* 8 U.S.C. § 1223(a).

**14.** Although stowaways are not given all the rights of excludable aliens, excludable aliens as a class are afforded fewer rights than are deportable aliens. *See Maldonado-Sandoval v. I.N.S.,* 518 F.2d 278, 280 n. 3 (9th Cir.1975).

The plain reading of the statutory scheme and the legislative history indicates that these laws were enacted to benefit the American public by keeping out undesirable aliens. This court finds Congress enacted § 1323 to "add new administrative penalties in connection with stowaways," *id.* at 1724, to deter carriers from transporting illegal aliens into the country, *id.* at 1710. Although plaintiffs concede that § 1323 was enacted to insure that stowaways would be held until exclusion could be effectuated, they also strenuously assert that this provision grants stowaways the "benefit" of being detained at an INS-designated facility. In response, defendants aver that § 1323 does not require the INS to designate any place of detention, and therefore that Congress did not confer any benefit on the stowaways.

This court disagrees with the INS's reading of § 1323(d). The statute imposes a fine on any carrier "who fails to detain [a stowaway] *on board or* at such other place as *may be designated by an immigration officer*" either before or after inspection if ordered to do so. This only leaves a carrier two options: to detain on board or to detain at another designated location. No provision in § 1323 is made for the carrier to detain at an undesignated location. Yet, this court is not persuaded that these procedures were designed for the "especial benefit" of the stowaway. *See Cort,* 422 U.S. at 78, 95 S.Ct. at 2087. Congress did not indicate that it intended to create a private remedy for stowaways to enforce the statutes' provisions. *See id.* In fact, a close reading of the provision indicates to the contrary; in § 1323, Congress denies stowaway the § 1225 right to

detention pending a hearing before a special inquiry officer and the § 1226 right to appeal. Thus, it would be inconsistent with the legislative scheme which denies stowaways the few rights afforded to other excludable aliens to imply a right of action under § 1323. *See id.*[15] Because plaintiffs do not satisfy the first three requisites of the *Cort v. Ash* test,[16] this court cannot imply a private right of action under § 1323. Accordingly, plaintiffs' motion for partial summary judgment on the statutory claims is denied and defendants' motion to dismiss the statutory claims against them is granted. Because this court was not able to dispose of these claims on statutory grounds, we must now address the merits of plaintiffs' constitutional allegations.

## III. CONSTITUTIONAL RIGHTS OF STOWAWAY DETAINEES

The constitutional deprivations described in plaintiffs' motion for summary judgment implicate the most fundamental rights: life and liberty. This court will first dispose of defendants contention that state action is lacking because the plaintiffs allegedly were not in INS custody. Then, after scrutinizing the relevant statutory provisions, this court will analyze the due process rights of detained aliens. Finally, the court will examine the federal defendants' actions in light of those rights and determine if their actions are protected under the qualified immunity doctrine.

### A. State Action

The fifth amendment prohibits governmental actions that would deprive "any person of life, liberty or property without due process of law." U.S.Const. amend. v.

---

**15.** *Cf. Chairez v. County of Van Buren,* 542 F.Supp. 706, 710–13 (W.D.Mich.1982) wherein the court implied a right of action under 8 U.S.C. § 1357(a)(2). That statutory provision authorizes INS agents to arrest aliens without a warrant under the enumerated circumstances. The provision also specifically provides that "the alien arrested shall be taken without unnecessary delay for examination before an office of the Service having authority to examine aliens as to their rights to enter or remain in the United States...." *Id.*

That case is distinguishable from this one because the very terms of § 1357(a) conferred the "benefit" of being examined without delay on the alien. Pursuant to that provision it was consistent with the legislative scheme to imply a private right of action. 

**16.** Immigration is not an area traditionally relegated to the states, but is exclusively regulated by the federal government. Therefore, the fourth element of the *Cort v. Ash* test would have been satisfied in this case.

Plaintiffs in the instant case claim they were deprived of life and liberty. The federal defendants contend that at all times the aliens were in the carrier's custody and the problems stemming from the plaintiffs' detention arose from purely private acts. As a consequence, they aver that there is no state action. In opposition, plaintiffs argue that the INS had a duty to oversee their detention and that the defendants' failure to do so constituted state action.

■ Regardless of who was in custody of the stowaways, this court finds that state action existed on the part of all defendants. Initially, it is uncontestable that the INS is an executive agency, 8 C.F.R. § 2.1 (1983), and that O'Neill and Jensen, as INS employees, are its agents. It is also undisputable that INS ordered the stowaways' detention otherwise they would have been permitted to land. *See* 8 U.S.C. §§ 1181, 1182(a)(18), 1223(a), 1227(a), and 1323(d). Therefore, this court finds obvious state action existed on the part of these federal defendants. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970).

Not only were the acts of the federal defendants state action, but likewise Bennings' and Danner's acts, making provisions to detain and actually detaining these stowaways, constituted state action. In defining the state action principle, the Supreme Court indicated that whether state action exists in a particular situation can be determined "[o]nly by sifting facts and weighing circumstances...." *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961). Further, the court stated that it would be an impossible task to define a precise formula for recognizing state action. *Id.* Yet, the court has formulated three lines of state action doctrine. Pertinent to the facts and circumstances of this case is the "public function" concept which provides that state action exists when the state delegates to private parties a power "traditionally exclusively reserved to the State." *Flagg Brothers v. Brooks*, 436 U.S. 149, 157, 98 S.Ct. 1729, 1734, 56 L.Ed.2d 185 (1978); *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352, 95 S.Ct. 449, 454, 42 L.Ed.2d 477 (1974); *Dobyns v. E-Systems, Inc.*, 667 F.2d 1219, 1222 (5th Cir.1982). The Supreme Court most recently stated, "the relevant question is not simply whether a private group is serving a 'public function' ... the question is whether the function performed has been 'traditionally the *exclusive* prerogative of the State.'" *Rendell-Baker v. Kohn*, 457 U.S. 830, 842, 102 S.Ct. 2764, 2772, 73 L.Ed.2d 418 (1982) (citing *Jackson*, 419 U.S. at 353, 95 S.Ct. at 454); *Blum v. Yaretsky*, 457 U.S. 991, 1011, 102 S.Ct. 2777, 2789, 73 L.Ed.2d 534 (1982).

This case implicated two spheres of power: immigration and detention. As this court found above, immigration which includes "the power to expel or exclude aliens," is a fundamental sovereign attribute exercised exclusively by the legislative and executive branches of the United States Government. *Shaughnessey*, 345 U.S. at 210, 73 S.Ct. at 628; *see supra* § I. Therefore, this court finds state action because Congress dictated and compelled action on the part of the INS and the carrier. *See Blum*, 457 U.S. at 1004, 102 S.Ct. at 2786.

Likewise, detention is a power reserved to the government, and is an exclusive prerogative of the state. As the Supreme Court stated,

[w]hile as a factual matter any person with sufficient physical power may deprive a person of his [life, liberty or] property, only a state or private person whose action "may be fairly treated as that of the State itself," *Jackson*, 419 U.S. at 351, 95 S.Ct. at 453, may deprive him of "an interest encompassed within the [Fifth or] Fourteenth Amendment's protection," *Fuentes v. Shevin*, 407 U.S. 67, 84, 92 S.Ct. 1983, 1996, 32 L.Ed.2d 556 (1972).

*Flagg Brothers*, 436 U.S. at 157, 98 S.Ct. at 1734.

Congress delegated the duty to order detention to the INS, 8 U.S.C. §§ 1223, 1227, 1323, and further delegated to both INS and the carrier the responsibility for

detention, *id.* § 1323(d), 1321(a); *see United States v. Aero-Mexico,* 650 F.2d 1062, 1064 (9th Cir.1981). In the case at bar, the INS ordered the stowaways' detention. 8 U.S.C. §§ 1227(a), 1323(d). The INS and Bennings arranged for their detention at the Galena Park facility and Danner's. *Id.* §§ 1323(d). Detention of the stowaways, whether on board ship or on land, was under the authority of the United States Government. *Shaughnessy,* 345 U.S. at 213, 73 S.Ct. at 629; *see Blum,* 457 U.S. at 1004, 102 S.Ct. at 2785. Therefore, because both immigration and detention are traditionally the exclusive prerogative of the State, it is evident that the actions of all the defendants were state action within purview of the public function doctrine.

B. Congressionally Mandated Process

Congress enacted a comprehensive scheme for processing aliens who seek entry into the United States. *See supra* § I. Upon arrival, all aliens are subject to inspection and examination. 8 U.S.C. § 1225(a). Immigration officers may conduct the inspection on board the vessel, *id.,* or may order the aliens' temporary removal to conduct the examination and inspection elsewhere "at a designated time and place," *id.* § 1223(a).[17] Once the immigration officer determines that an alien is excludable pursuant to § 1182, the alien is to be excluded immediately. *Id.* § 1227(a). When immediate exclusion would be impracticable or improper, Congress gave the Attorney General discretion, in an individual case, to stay exclusion and permit temporary detention. *Id.* Because a stay is usually granted to accommodate the carrier who was obligated to make arrangements for the excluded aliens' return transportation, Congress was careful to specify that all detention expenses shall be borne by the carrier, and not the taxpayer.

Although many provisions refer to detention, none specify the actual place of detention. For example, § 1223(b) states that the carrier shall pay all expenses for a temporary "removal to a designated place for examination and inspection or other place of detention;" and similarly § 1227(a) imposes the "cost of maintenance including detention expenses" on the carrier. In § 1323, the onus is clearly put on the INS to designate the place of detention when it imposes a fine on any carrier

> who fails to *detain on board* or such other *place* as *may be designated by* an *immigration officer* any alien stowaway until such stowaway has been inspected by an immigration officer, or who fails to *detain* such stowaway *on board or* at such other *designated place* after inspection if ordered to do so *by* an *immigration officer* ....

*Id.* § 1323(d).

The Act clothes the Attorney General with the responsibility to arrange "for appropriate places of detention" for aliens pending deportation. Where no federal buildings are available, he is authorized either to rent or build suitable places for detaining aliens. *Id.* § 1252(c). Presumably, any INS detention facilities would be used to accommodate both excludable and deportable aliens.

Congress' main concern is that excludable aliens are not permitted to land. *See id.* §§ 1223(a), 1227(a). To accomplish this end, Congress holds the carrier ultimately responsible for excludable aliens: the carrier may be ordered to detain them on board, the carrier must assume all expenses of removal and detention, the carrier must provide their return transportation, the carrier is subject to fines for any excludable aliens who escape from their custody. *See id.* §§ 1223(a), (b), (c), 1227(a), (b), 1323(a), (b), (d). The carrier remains under all these obligations except that they may "be relieved of the duty of safekeeping of such aliens" during a temporary removal, *id.* § 1223(a), or when INS assumes custody during a temporary detention. *See United States ex rel. Russo v. Thompson,* 188 F.2d 244, 245 (2d Cir.1951).

After a thorough review of the entire statutory scheme a few salient facts

---

17. Congress provided, however, that any temporary removal would not be considered a "landing" of the aliens, nor would it relieve the carrier of any obligations imposed on them if the aliens stayed on board. *Id.*

stand out: the Attorney General must provide appropriate detention facilities, *see id.*, Congress authorizes detention in many circumstances, and the INS is responsible for designating the place of detention. Congress obviously contemplated that INS would provide the place of detention but wanted to ensure that the taxpayer would not have to pay the maintenance and detention expenses of these excludable aliens. Therefore, in virtually every provision mentioning detention Congress painstakingly specifies that the carrier shall bear all costs. Had Congress thought anyone other than the government were to furnish the facilities for detention, attention to this detail would be superfluous. Accordingly, this court can draw only one conclusion: Congress contemplated that INS would assume responsibility for detention. Because INS is a governmental entity, Congress intended the agency to furnish suitable facilities which comply with minimum due process standards. It is now incumbent upon this court to determine whether the conditions of plaintiffs' detention comported with fifth amendment due process.

### C. Due Process Rights of a Stowaway Detainee

Although "[p]hysical detention of aliens is now the exception, not the rule, and is generally employed only as to security risks or those likely to abscond," *Leng May Ma v. Barber*, 357 U.S. 185, 190, 78 S.Ct. 1072, 1075, 2 L.Ed.2d 1246 (1958), as early as 1896 the Supreme Court recognized that aliens could be summarily excluded because they did not meet congressional requisites for admission and could be detained or temporarily confined pending exclusion; but, absent an adjudication of guilt by a judicial trial, detained aliens may not be punished. *Wong Wing*, 163 U.S. at 235–37, 16 S.Ct. at 980–81. An alien detained pending exclusion is thus in the same position with similar rights to an accused held prisoner pending a trial. *Rodriguez-Fernandez v. Wilkinson*, 654 F.2d 1382, 1387 (10th Cir.1981). Therefore, this court will examine these cases for their applicability to stowaway detainees.

The right of a pretrial detainee to be free from punishment is well settled, *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), and the conditions of confinement amounting to punishment has been often litigated. *See, e.g., id.; Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Jones v. Diamond*, 636 F.2d 1364 (5th Cir.), *cert. dismissed*, 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981); *Davis v. Smith*, 638 F.2d 66 (8th Cir.1981).

In *Bell v. Wolfish* the Supreme Court enunciated that the standard to evaluate the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law ... is whether those conditions amount to punishment of the detainee.... ... A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees.

441 U.S. at 535–39, 99 S.Ct. at 1872–74.

Applying this standard, the *Bell* court found that double bunking did not violate due process because the inmates were locked in their cells only six hours per day to sleep, the inmates had access to ample space in the common areas throughout their waking hours, and the average length of detention was less than sixty days. *Id.*

at 543, 99 S.Ct. at 1876. Many courts since *Bell* have been confronted with more egregious jail conditions, amounting to punishment in violation of the *Bell* standard. *See, e.g., Jones v. Diamond,* 636 F.2d 1364 (5th Cir.1981); *Davis v. Smith,* 638 F.2d 66 (8th Cir.1981); *McMurry v. Phelps,* 533 F.Supp. 742 (W.D.La.1982).[18] Other courts have enunciated minimum constitutional standards for inmates, which include, *inter alia,* that the number of inmates not exceed the design capacity for the institution, that each prisoner be given a bed off the floor with a clean mattress and clean linen, that prisoners be given three meals per day and be fed outside of their cells, that prisoners be given adequate opportunity for physical recreation, and furthermore that the staff be provided appropriate and effective training programs. *Pugh v. Locke,* 406 F.Supp. 318, 332–35 (M.D.Ala.1976), *aff'd in part sub nom. Newman v. Alabama,* 559 F.2d 283 (5th Cir.1977), *modified sub nom. Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978); *Gates v. Collier,* 423 F.Supp. 732, 743 (N.D.Miss.1976), *aff'd,* 548 F.2d 1241 (5th Cir.1977); *Alberti v. Sheriff of Harris County,* 406 F.Supp. 649, 676–78 (S.D.Tex. 1975); *Miller v. Carson,* 401 F.Supp. 835, 874 (M.D.Fla.1975), *aff'd,* 563 F.2d 741 (5th Cir.1977).

▮ In this case, the plaintiffs' detention does not meet the constitutional standards set forth in current case law. All sixteen aliens held at Danner's were detained in a twelve by twenty foot windowless cell. As a consequence, each detainee had only fifteen square feet of living space. Because the cell was designed to accomodate no more than six people overnight, ten individuals did not have a bed off the floor. The aliens were detained in the cell twenty-four hours per day without any opportunity for physical exercise and were fed in their cells. Further, the guards at Danner's are not adequately trained to de-

tain aliens, the facilities were not subject to INS inspection or regulation, the facilities were not secure enough to hold sixteen people as evidenced by the ease of the stowaways' escape.

In their defense, defendants assert that their actions were protected under the qualified immunity doctrine. Federal officials are entitled to qualified immunity for constitutional torts committed while exercising official discretion; however, to qualify for immunity, the official's acts must have been within the scope of his powers. *Butz v. Economou,* 438 U.S. 478, 489–90, 506–08, 98 S.Ct. 2894, 2902, 2910–11, 57 L.Ed.2d 895. Moreover, only officials whose position requires the exercise of official discretion can claim the privilege of qualified immunity. *Williams v. Treen,* 671 F.2d 892, 896 (5th Cir.1982), *cert. denied,* 459 U.S. 1126, 103 S.Ct. 762, 74 L.Ed.2d 977 (1983). The burden is on the official to affirmatively allege the immunity defense, and to "show that the allegedly wrongful actions '. . . were undertaken pursuant to the performance of his duties and within the scope of his discretionary authority.' *Barker v. Norman,* 651 F.2d 1107, 1124–25 (5th Cir.1981)." *Id.* Once the defendants establish this defense, the burden then shifts to the plaintiffs to prove that the defendants' actions violated clearly established law. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1982); *Saldana v. Garza,* 684 F.2d 1159, 1163 (5th Cir.1982), *cert. denied,* 460 U.S. 1012, 103 S.Ct. 1253, 75 L.Ed.2d 481 (1983).

Pursuant to § 1225(a), the INS ordered the inspection and examination of the aliens on the vessel Cartagena De Indios. The officers determined that the stowaways were excludable under § 1182(a)(18). Because of the large number of stowaways, and the ship's lack of detention facilities, District Director O'Neill exercised his discretion pursuant to § 1227(a) to

---

18. *See also Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (Supreme Court affirmed finding that overcrowding an average of four, or as many as eleven, prisoners in windowless 8′ × 10′ cell, mattresses on floor issued at random, poor diet, violence in cells, guards use of physical violence and sticks to maintain order, prisoners in isolation. for months constituted violation of eight amendment prohibition against cruel and unusual punishment).

stay immediate exclusion and allowed the stowaways' temporary detention in the Port of Houston. O'Neill assured that accommodations were available to detain the aliens at Galena Park facility; twenty were detained there and six were detained at Danner's. After the first night, Galena Park could no longer accommodate all twenty stowaways, therefore, Carl Jensen authorized the release of ten aliens to the custody of Danner. Both O'Neill and Jensen knew that any aliens who were not detained in the INS contract facilities ultimately would be detained by Danner, and that the INS had neither inspected Danner's facilities nor attempted to regulate the procedures Danner used to effectuate detention.

This court further finds that, at the time of the events in question, the law regarding the permissible standards of detention was clearly established. As early as 1895 the Supreme Court held in *Wong Wing* that detained aliens were entitled to fifth amendment due process and could not be punished absent an adjudication of guilt. 163 U.S. at 235–37, 16 S.Ct. at 980. In 1979, the Supreme Court set down the *Bell* standard for determining the conditions of confinement which amount to punishment. 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447. Lower courts have been ruling on what constitutes the minimally acceptable conditions of detention since as early as 1975, *Alberti*, 406 F.Supp. at 676–78; *Miller*, 401 F.Supp. at 874, and 1976, *Pugh*, 406 F.Supp. at 332–35; *Gates*, 423 F.Supp. at 743. For these reasons, the court finds that the conditions of plaintiffs' detention violated due process and that defendants' good faith immunity defense must fail. Plaintiffs' motion for partial summary judgment against the federal defendants for constitutional deprivations is therefore granted, and defendants' motion to dismiss those claims is denied.

### D. Remedies

This court has found that plaintiffs' constitutional rights to due process were deprived when the INS ordered their detention but failed to assure they were detained in a facility in compliance with due process dictates. Therefore, plaintiffs are entitled to a remedy. They seek declaratory relief against the INS, O'Neill, and Jensen in their official capacities as well as monetary relief against O'Neill and Jensen as individuals. At this time, the court cannot make a ruling on the appropriate relief, and requests further briefing from the parties.

### CONCLUSION

Accordingly, it is hereby ORDERED, ADJUDGED, and DECREED that plaintiffs motion for partial summary judgment against O'Neill, Jensen, and the INS for violations of the fifth amendment is GRANTED and defendants' motion to dismiss those claims is DENIED. It is further ORDERED that plaintiffs' motion for partial summary judgment for violations of 8 U.S.C. § 1323(d) is DENIED and defendants' motion to dismiss those statutory claims against them is GRANTED. Both parties are ordered to present this court with briefs on the appropriate remedy within twenty days of the date of this Order and a hearing will be held as soon thereafter as the court's calendar will permit.