James T. KESLER, et al.,

v.

Brazoria County Sheriff KING, et al.

Civil Action No. G–96–703.

United States District Court,
S.D. Texas,
Galveston Division.

Dec. 7, 1998.

Lynn J. Klement, Attorney at Law, Angleton, TX, David M. Feldman, Feldman and Rogers, Houston, TX, for James T. Kesler, Kevin Lynn Kisling, Corey Hines, Elvin Logan, Nelson King, Jr., Elvin Kelly, Larry Green, Michael McCurry, Ray Rollins, Tyrone Taylor, Robert Tucker, Lester Waltrip, Ali Williams, Andray Wright, Devon Callahan, James Morrow-Bey, Fred Battle, Kent Carr, Melvin Hardy, James Curry, Leo Thoby, plaintiffs.

Lynn J. Klement, Attorney at Law, Angleton, TX, David M. Feldman, Richard A. Morris, Feldman and Rogers, Houston, TX, John David Fischer, Brown McCarroll & Oak, Houston, TX, Clark Woodson, III, Klement and Woodson, Angleton, TX, for Leon P. Sherman, Jamie Evans, Daryl Walton, Michael Clemmons, Ronald Porter, Quinton Pittman, Vincent Tallie, Eddie Wright, Robert Beene, plaintiffs.

Otto Dennis Hewitt, III, Attorney at Law, Alvin, TX, for K–9 Unit Dog Handler, John Does 1–3, Sheriff Deputies, John Doe 1–7, CCRI Guards, Lt. Wallace, Capital Corrections Resources, Inc., defendants.

Barry Abrams, Abrams Scott and Bickley, Houston, TX, Henry W Prejean, Jr, Attorney at Law, Angleton, TX, Otto Dennis Hewitt, III, Attorney at law, Alvin, TX, Ronald L. Barclay, Asst. District Atty., Angleton, TX, for EJ King, Sheriff, defendant.

Henry W. Prejean, Jr., Attorney at Law, Ronald L Barclay, Asst. District Atty., Angleton, TX, for Brazoria County, Charles S. Wagner, Lt. Robert A. Christopher, Tim L. Wright, C. Kincheloe, Sgt. Martinez, Sgt. Harold Carter, Noell A. Therrien, Bobby Crawford, Asst. Warden Glenn, Lt. James Middleton, Lt. David Wallace, Sgt. Murphy, defendants.

Henry W. Prejean, Jr. Attorney at law, Ronald L. Barclay, Asst. District Atty., Angleton, TX, W. Stacey Mooring, Attorney at Law, Houston, TX, for D. Cisneros, Lt. Lester Arnold, Daryl French, defendants.

Bob Presson, John Mollenkamp, Missouri Attorney General's Office, Jefferson City, MO, for Missouri Department of Corrections, movant.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

KENT, District Judge.

Plaintiffs in this case allege that officers of the Brazoria County Sheriff's Office and Capital Correctional Resources, Inc. ("CCRI"), used excessive force against them and in some cases unlawfully searched them during the course of their imprisonment in the Brazoria County Detention Center. Plaintiffs, former inmates of the CCRI private prison facility in the Brazoria County Detention Center, filed this action asserting claims of excessive force, unlawful search, failure to screen and hire, failure to train and supervise, and failure to intervene under 42 U.S.C. § 1983. In addition, they allege state-law claims of assault and battery, intentional infliction of emotional distress, negligent hiring, negligent training and supervision, and negligent use of personal property. Now before the Court are Defendants' Motions for Summary Judgment. For the reasons that follow, Defendants' Motions are **GRANTED IN PART, DENIED IN PART.**

### I. FACTUAL SUMMARY

#### A. Early Overtures and Hiring Decisions

In February 1996, Capital Correctional Resources, Inc. ("CCRI") initiated a discussion with the Sheriff of Brazoria County, Defendant E.J. Joe King ("King"), concerning the prospect of leasing a portion of the Brazoria County Detention Center in Angleton to house out-of-state prisoners. After his preliminary discussion with CCRI officials, Sheriff King began serving as a sort of point man on the proposed deal. King consulted with representatives of the Brazoria County Commissioners Court, then met again with CCRI officials. The deal, King testified in his deposition, sounded like a "money-maker" for the County. Subsequently, CCRI and the Commissioners Court began negotiating an agreement to lease a portion of the jail.

In response to a request from CCRI, meanwhile, King recommended that the company consider hiring as its warden one Bob-

by Ray Crawford ("Crawford"), a former warden in the Texas Department of Corrections system with whom he had long been acquainted. Upon King's recommendation, CCRI hired Crawford for the position. When the proposed deal was finalized, Crawford assumed the top position in a private prison that would occupy 512 of the Brazoria County Detention Center's 1,163 inmate beds at a lease cost of $10 per bed per day, outside of expenses. Among the salient features of the contract between CCRI and Brazoria County were the following:

- CCRI would pay Brazoria County for certain services to be performed by the Sheriff's Office on its behalf;
- All CCRI hiring and training decisions and policies would be subject to Sheriff King's review and approval;
- Brazoria County and Sheriff King would be obligated to assist in the training of CCRI personnel;
- Brazoria County and Sheriff King would be obligated to provide CCRI all information necessary for the screening of its applicants;
- Brazoria County and Sheriff King would be obligated to certify all jailers prior to their assuming duties in the newly created prison; and
- Sheriff King would be required to monitor CCRI's operations.

On August 6, 1996, Brazoria County entered into a contract with the state of Missouri to house low- to medium-security Missouri inmates in the CCRI portion of the Brazoria County Detention Center at a cost of $41 per inmate per day. According to Sheriff King's deposition testimony, the profits to Brazoria County were projected to be $2 million over the next three years. Among the salient features of this contract were the following:

- Brazoria County would provide the Missouri inmates all necessities on the same basis it provided them for its own inmates;
- All disciplinary actions taken against the Missouri inmates must be reasonable, proportionate to the violation, impartial and non-discriminatory, neither arbitrary nor retaliatory, and not physically abusive; and
- Reports of all disciplinary actions taken against Missouri inmates must be provided within five days of the punishment administered.

In late August, Crawford assumed a full-time role as CCRI warden. His first duties were to interview and hire personnel to staff the new prison. Under the contract with Brazoria County, applicants first had to be screened through the Sheriff's Office, which would review all application materials and conduct background checks. Sheriff King appears to have had what was essentially a veto power over all applicants. However, King's veto was not the limit of his powers over the CCRI facility's hiring practices. In spring 1996, King had asked Crawford to hire David Wallace ("Lieutenant Wallace") and Daryl David French ("Sergeant French"). Wallace and French each had a criminal conviction on his record; in fact, each had been convicted and served prison sentences for the 1983 beating of a TDC inmate. Both King and Crawford knew that these two particular applicants had criminal records. Crawford, for one, testified that he purposely refrained from delving into the specifics of Wallace's background because he "didn't want to know." For his part, Sheriff King ignored their backgrounds and approved their hiring. In his deposition, King admitted that he imposed less stringent screening standards on CCRI applicants than he did on candidates for county jobs in the Brazoria County Detention Center. Apparently by way of explanation, King testified in his deposition that CCRI personnel were more CCRI's business than his.[1]

## B. Training of CCRI's Personnel

Although the contract between CCRI and Brazoria County required Sheriff King and the Sheriff's Office to provide training for the CCRI officers, neither King nor his subordinates ever scheduled any training for the

---

1. However, on at least one occasion, Sheriff King blocked the employment of an applicant because, he testified, he "did not like [the applicant] and [he] didn't want him on this facility." That applicant had no criminal background.

new CCRI personnel, many of whom had never been jailers, prior to the beginning of CCRI operations in September 1996. Prior to September 18 of that year, the only training that CCRI personnel had received was in opening and closing the cellblock doors.

### C. The Arrival of the Missouri Inmates

The first group of Missouri inmates arrived at the CCRI facility on September 16, 1996. Upon their arrival, according to testimony, the inmates began acting in a "boisterous" manner. Shortly after they arrived, Sheriff King called Warden Crawford into his office to find out why the inmates were being so loud. Crawford responded that he hoped they would settle down, but that if he had to go in and settle them down, he would need assistance from the Sheriff's Office because he did not have enough experienced personnel to handle the task. King responded somewhat cryptically, instructing Crawford that he should tell the inmates to settle down or they would face his "Ninja Squad." Crawford relayed the message; later, he personally responded to reports of unruly conduct by the inmates and settled them down peacefully.

### D. The Disturbance

Crawford reported the incident primarily made the basis of this suit to King on September 18. He also reiterated the possible need for assistance in handling any further misconduct. In response to this concern, apparently, King contacted Chief Deputy Charles S. Wagner and told him to put the Emergency Response Team ("ERT Team") on standby that very evening.[2] According to the testimony of Lieutenant Robert Christopher, the ERT field commander, the team immediately went on standby with no knowledge of its assignment beyond the possibility that CCRI personnel might need assistance with the CCRI inmates. Also on standby with the ERT Team was a K–9 (police dog) unit. Someone had apparently directed that

the K–9 be included in the team, though Chief Deputy Wagner later testified that he never ordered the use of a K–9 or was even aware that one was involved until much later. ERT Team members on standby included Noel Therrien, Tim Wright, and Chris Kincheloe. Other officers on standby were Sergeant Santos Martinez and K–9 handler Deputy David Cisneros, neither one of whom were ERT Team members.[3] Martinez, who had no training in ERT tactics, volunteered to operate a video camera if one was needed.

The ERT Team personnel and other officers waited much of the evening for someone to brief them on the nature of their assignment. However, no one ever appeared. In their depositions, the team members testified that they had no idea what their job roles were to be.

Later that evening, after the ERT Team had been on standby for some time, CCRI personnel reported that they detected marijuana smoke coming from one of the inmate pods in the CCRI wing. At that point, someone called the ERT Team in.[4] Christopher testified that CCRI officers asked the team only to secure one cell in the pod where marijuana had been detected; further, he testified, the ERT Team was not advised that the inmates were behaving disruptively. Nonetheless, the ERT Team went into the pod only after requesting that the ventilation system be shut down in case pepper gas become necessary. Seven Sheriff's Office deputies and approximately fifteen CCRI officers followed the ERT Team into the pod. Among these other officers was Lieutenant Lester Arnold ("Arnold"), who took along a stun gun and two canisters of pepper foam, and CCRI Lieutenant Wallace.

At that point, Warden Crawford testified, there was no disturbance among the inmates. Despite that, the ERT Team entered the pod and ordered all the inmates to the floor. The inmates readily complied with the order, and

---

2. Only Sheriff King and Chief Deputy Wagner could authorize the use of the ERT Team.

3. Therrien, Wright, Kincheloe, and Martinez have been dismissed without prejudice from this case. Of the officers on standby with the ERT

Team, only Deputy Cisneros remains a party in this suit.

4. Sheriff King and Warden Crawford's testimony on this point differs on who actually ordered the team into the pod.

a team of officers began searching the cell. Lieutenant Christopher ordered the inmates to crawl out of the cell block on their stomachs, single-file. On the video recording made by Sergeant Martinez, Martinez can be heard yelling at the inmates in graphic language. During the crawl out of the pod, CCRI Lieutenant Wallace kicked several inmates and stepped on one inmate's back without provocation. According to Warden Crawford's testimony, the search ultimately proved at least partially fruitful: Inside a cell, an officer found a single marijuana cigarette butt.[5]

After the officers completed the search, they forced the inmates to crawl single-file back into the pod, where they were ordered to strip off all their clothes and throw them into a pile.[6] After the inmates finished undressing, the officers subjected them to body and cavity searches.[7] The officers then forced the inmates to remain naked and face-down on the floor for a substantial period of time, after which they ordered them to crawl naked back to their bunks. The inmates remained naked on their bunks for approximately two hours.

After completing the shakedown of the first pod, the ERT Team moved to another pod.[8] There is no evidence of any violence occurring in this pod prior to the ERT Team's arrival; on the contrary, the videotape made by Sergeant Martinez shows that the inmates were playing cards when the ERT Team arrived. Nonetheless, an ERT Team member deployed a canister of tear gas as the inmates attempted to comply with the shakedown.[9] According to Lieutenant

Christopher's testimony, the ERT Team shut the inmates in the pod while they retreated to clear their eyes and secure their gas masks. With those tasks accomplished, they moved into the pod again. Several of the inmates had pressed towels to their faces to escape the effects of the tear gas. The officers ripped the towels away, then forced the inmates to crawl single-file on their stomachs out of the tank. This scene repeated itself in two other pods. Throughout the evening, the video camera operated by Sergeant Martinez captured the sound of the stun gun employed by Lieutenant Arnold going off repeatedly as it made contact with several inmates. Deputy Cisneros, the K–9 handler, was also captured on videotape apparently employing the German Shepherd against several inmates, many of whom were apparently bitten by the animal. Finally, at around 10:30 or 11 p.m., the ERT Team departed and stood down in the Brazoria County Sheriff's Office patrol office until around 2 a.m., when they were informed that the CCRI wing was once again running smoothly.

### E. The Aftermath

Over a period of several months following the incident, top CCRI and Brazoria County personnel declined repeatedly to address several concerns raised by the officers' conduct or to acknowledge any misconduct by jail personnel. Shortly after the incident, Warden Crawford, as he was required to do under the terms of Brazoria County's contract with the state of Missouri, wrote the Missouri Department of Corrections a brief letter describing the events of September 18. Despite his obligation to render a full ac-

---

5. The officer reportedly placed the butt in a Styrofoam cup and gave it to a supervising officer. However, the butt subsequently disappeared. No records that would indicate the ultimate whereabouts of the butt have ever been produced.

6. In his deposition, Chief Deputy Wagner testified that ordering the inmates to strip in full view of everyone present in this fashion was unnecessary and humiliating.

7. At least one CCRI officer conducted several such searches despite the fact that he had received no training in how to conduct a strip search. In fact, this officer had received no training at all in law enforcement.

8. Lieutenant Christopher testified that the ERT Team went to the other pod in response to a possible disturbance. However, CCRI Sergeant Dennis Murphy testified that nothing out of the ordinary was going on in the pod, that he had received no advance notice of the ERT Team action, and that he had no idea why the team came to the second pod.

9. Warden Crawford, who was present at the time of the shakedown in the second pod, testified that he was forced to hit the floor to avoid the effects of the tear gas.

counting of such incidents, however, Warden Crawford did not even view the videotape of the incident.[10] The letter also included several misstatements and omitted key facts.[11] Within a week of the incident, Lieutenant Christopher and Deputy Cisneros also filed reports of their own, emphasizing to Sheriff King and Chief Deputy Wagner the lack of training among CCRI personnel. This lack of training, coupled with an excessive number of "non-essential personnel" at the shakedowns, had complicated the situation in the cell blocks and created a significant hazard, the two officers concluded.[12] At the same time, Chief Deputy Wagner showed Sheriff King a portion of the videotape that depicted Lieutenant Arnold discharging his stun gun against an inmate. Despite these reports from Wagner, Christopher, and Cisneros, King expressed no interest in viewing the remainder of the videotape. Moreover, he made no effort to communicate any concerns he might have had to CCRI, reasoning that CCRI had leased the space and that it was "their operation" and their responsibility.[13] Almost a week after the incident, Sheriff King wrote a brief letter concerning the events to the Texas Commission on Jail Standards. Like Warden Crawford's letter to the Missouri officials, King's letter featured several misstatements and key omissions.[14] Ultimately, Brazoria County

suspended Lieutenant Arnold without pay for ten days for his use of the stun gun.[15] Arnold was the only Brazoria County employee to suffer any formal disciplinary action. According to the testimony of Sheriff King, he took no action against any of the other officers involved because, while "it was unnecessary what they did ... I didn't see it as totally unreasonable."

Sheriff King and the other Brazoria County and CCRI officials involved showed similar disregard toward the more than thirty grievances filed by inmates over the incident. Brazoria County forwarded each grievance it received to CCRI with a recommendation that an internal investigation be conducted. Despite statements indicating that they would investigate the grievances, CCRI officials apparently never did.

The CCRI inmates were not the only parties to encounter significant difficulties in their efforts to determine what went wrong on September 18. Outside requests for information regarding the incident produced ready compliance from neither Brazoria County nor CCRI. In early 1997, an official with the Missouri Department of Corrections who had become aware of the existence of the videotape requested a copy. Warden Crawford, upon the advice of Chief Deputy Wagner, told the Missouri official that the

10. Warden Crawford's failure to view the videotape was an omission that he did not correct until almost a year later, after a released copy of the video had been broadcast on numerous television news programs.

11. For example, Warden Crawford told the Missouri Department of Corrections that only those CCRI inmates that did not comply with orders to leave their cells were forcibly removed. In addition, he failed to mention that the inmates were all stripped and forced to endure body and cavity searches.

12. In this report, Deputy Cisneros included information indicating that three inmates had suffered verified dog bites and that two others had reported similar injuries. Deputy Cisneros attached Polaroid photographs of the bite victims. However, the photographs have since disappeared and have not been located.

13. Chief Deputy Wagner did view the videotape in its entirety. One of the prominent figures on the videotape was CCRI Lieutenant Wallace,

whose prior conviction for inmate abuse was well-known to Wagner. Although he concluded that Lieutenant Wallace had acted inappropriately, Wagner declined to pursue the matter of Wallace's conduct with CCRI because, like Sheriff King, he did not consider Wallace to be Brazoria County's problem.

14. For example, Sheriff King reported only two dog bites and gave accounts of each that differ from other versions of the events. According to his letter, the first occurred when an inmate who appeared to be hiding contraband tried to kick the police dog, and the second occurred when another inmate ignored orders and "kept trying to get up." King omitted any reference to the presence of the ERT Team or any Brazoria County officers other than the K-9 handler, the use of a stun gun against several inmates, the discharge of tear gas, the stripping of the inmates, and the body and cavity searches of the inmates.

15. An internal investigation of Lieutenant Arnold's role in the incident concluded that Arnold discharged the stun gun against as many as nine inmates that evening.

videotape was a training tape. The official never received a copy. Similar efforts by the Texas Commission on Jail Standards and the Missouri Department of Corrections to look into allegations of inmate mistreatment had no effect either.[16] It was not until August 1997, when the videotape was broadcast on numerous television news programs, that the Brazoria County Commissioners Court even viewed it. Subsequently, Sheriff King and Warden Crawford finally viewed the tape in its entirety.[17] The multiple television broadcasts of the videotape spurred a relatively significant public outcry. Chief Deputy Wagner responded to the controversy by labeling the video a "training tape" in an interview with a local television station. Wagner characterized the tape in this fashion despite his knowledge that the tape had not been made for training purposes.[18] Soon after the videotape came to public light, the Missouri Department of Corrections terminated its contract with Brazoria County and immediately began removing inmates from the jail.

### F. The Conduct of CCRI Lieutenant Wallace

September 18, 1996 was apparently not the only incident of force in the CCRI portion of the Brazoria County Detention Center. Shortly after the events of that evening, Sergeant Dale Fletcher began receiving two to five inmate grievances each week alleging excessive force by Lieutenant Wallace. Fletcher testified that he submitted the complaints directly to CCRI officials, including Warden Crawford.[19] Crawford testified that CCRI investigated the complaints and concluded that they were unfounded. Under CCRI policy, any investigation of Wallace or any other CCRI guard would result in a record of the investigation. However, record exists of only one investigation into Lieutenant Wallace's conduct. Moreover, when the number of grievances filed against Wallace dwindled dramatically even as several inmates complained that the Sheriff's Office was not receiving their grievances, Sergeant Fletcher began to suspect that someone was tampering with the grievance box. Fletcher's suspicions were confirmed in part when he discovered that the grievance box had been broken into at least three times. Moreover, a psychologist employed by CCRI for a brief period during 1996 and 1997 testified that she witnessed Lieutenant Wallace physically abusing an inmate and that she had seen Wallace perfunctorily screen and discard inmate grievance forms.

### II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When a motion for summary judgment is made, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Issues of material fact are "genuine" only if they require resolution by a trier of fact. *See id.* at 248, 106 S.Ct. at 2510. The mere *existence* of

---

**16.** Warden Crawford learned at that time that complaints made to the Missouri Department of Corrections had found their way via a Missouri state representative onto the desk of Texas Governor George W. Bush, who had subsequently passed them along to the Commission on Jail Standards. Despite this knowledge, Crawford testified, he did not feel any heightened need to view the videotape or take any further action to look into the incident.

**17.** In fact, this was Warden Crawford's first viewing of the videotape at all.

**18.** According to the testimony of Lieutenant Christopher, who had explained to both Chief Deputy Wagner and Sheriff King the origins of the videotape, the Sheriff had hoped to explain away the "bad scene" created by the existence of the videotape by mischaracterizing its nature.

**19.** Sergeant Fletcher also testified that he told Chief Deputy Wagner that he had received "numerous" inmate grievances against CCRI Lieutenant Wallace alleging excessive force. However, Wagner testified that even though Sergeant Fletcher "could have" informed him of the high number of grievances, Wallace's actions were CCRI's responsibility rather than Brazoria County's. There is no evidence that Wagner or any other Brazoria County Sheriff's Office personnel took any actions to investigate the excessive force complaints against Lieutenant Wallace.

some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *See id.* at 247–48, 106 S.Ct. at 2510. If the evidence is such that a reasonable factfinder could find in favor of the nonmoving party, summary judgment should not be granted. *See id.; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Dixon v. State Farm Fire & Casualty Co.,* 799 F.Supp. 691 (S.D.Tex.1992) (noting that summary judgment is inappropriate if the evidence could lead to different factual findings and conclusions). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

## III. ANALYSIS

The violence allegedly worked against Plaintiffs on September 18, 1996 and the months following and the alleged failure by top Brazoria County and CCRI officials to prevent or mitigate the resulting harm forms the basis of this lawsuit. Plaintiffs, all former inmates of the CCRI facility, have brought claims against the individual officers involved in these incidents alleging violations of 42 U.S.C. § 1983 and assault and battery and intentional infliction of emotional distress under state law.[20] In addition, Plaintiffs have brought claims against officials of both Brazoria County and CCRI who had supervisory authority over the officers involved. Against Sheriff King, Chief Deputy Wagner, and CCRI Warden Crawford, Plaintiffs assert claims alleging violations of 42 U.S.C § 1983 and intentional infliction of emotional distress and negligent hiring, training, and supervision under state law. Against Brazoria County Lieutenant Christopher, Plaintiffs claim alleged violations of 42 U.S.C. § 1983 and intentional infliction of emotional distress under state law. Finally, Plaintiffs have

brought claims against both Brazoria County and CCRI alleging violations of 42 U.S.C. § 1983 and assault and battery, intentional infliction of emotional distress, negligent hiring, training, and supervision, and negligent use of personal property under state law. Now before the Court are Motions for Summary Judgment from Defendants King, Wagner, Crawford, Christopher, Brazoria County, CCRI, Cisneros, Arnold, and Wallace. The Court will first address Plaintiffs' claims under § 1983 as they relate to each Defendant and then proceed to each of Plaintiffs' state law claims.

## A. Plaintiff's Claims under § 1983

Section 1983 provides that any person who, under color of state law, deprives another of "any rights, privileges or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983. "Rather than creating substantive rights, § 1983 simply provides a remedy for the rights that it designates." *Johnston v. Harris County Flood Control Dist.,* 869 F.2d 1565, 1573 (5th Cir.1989). Before they can successfully assert § 1983 as a valid cause of action against these Defendants, Plaintiffs must first identify a specific constitutionally protected right that has been infringed. *See Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989). In their attempt to establish § 1983 liability against the Brazoria County and CCRI officer Defendants, Plaintiffs allege that they were assaulted by these Defendants in a manner that violated their Eighth Amendment right to be free from cruel and unusual punishments, *see Hudson v. McMillian,* 503 U.S. 1, 8–9, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992), and, in some cases, searched in a manner that violated their Fourth Amendment right to be free from unreasonable searches, *see United States v. Lilly,* 576 F.2d 1240, 1244 (5th Cir.1978); *see also Elliott v. Lynn,* 38 F.3d 188, 191 n. 3 (5th Cir.1994).

---

**20.** Although Plaintiffs named several officers as defendants in their Third Amended Complaint, most of those officers have been dismissed without prejudice. For the purposes of these mo-

tions, the only individual officers remaining as Defendants are Brazoria County Sheriff's Deputy Cisneros, Brazoria County Lieutenant Arnold, and CCRI Lieutenant Wallace.

Conversely, in their attempt to establish § 1983 liability against Defendants King, Wagner, Crawford, and Christopher, Plaintiffs advance three theories. First, Plaintiffs argue that Defendants King, Wagner, and Crawford had a duty to properly screen and hire applicants, and that their failure to do so demonstrates a deliberate indifference to Plaintiff's constitutional rights. *See Board of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, ——, 117 S.Ct. 1382, 1392, 137 L.Ed.2d 626 (1997). Second, Plaintiffs argue that Defendants King, Wagner, and Crawford had a duty to train and supervise the individual officers under their command, and that their failure to do so demonstrates a deliberate indifference to Plaintiffs' constitutional rights. *See, e.g., Doe v. Hillsboro Indep. Sch. Dist.,* 113 F.3d 1412, 1417 (5th Cir.1997). Third, Plaintiffs contend that Defendants Crawford and Christopher had an affirmative duty to intervene to protect them from the individual officers' use of excessive force, and that their failure to do so demonstrates a deliberate indifference to Plaintiffs' constitutional rights. *See Hale v. Townley,* 45 F.3d 914, 919 (5th Cir.1995).

Each Defendant has moved for summary judgment on Plaintiffs' § 1983 claims on various grounds. With the exception of CCRI Defendants Crawford and Wallace, each individual Defendant has also asserted qualified immunity as a basis for summary judgment. The Court will now address each Defendant's arguments in turn.

1. *Defendant King is not entitled to summary judgment on Plaintiffs' § 1983 claims.*

Defendant King offers three arguments in support of his Motion for Summary Judgment on Plaintiffs' § 1983 claims. First, he argues that he is entitled to qualified immunity. Second, he argues that Plaintiffs have offered no summary evidence establishing deliberate indifference on his part to the training and supervision of the Brazoria County officers. Finally, he argues that he

is not responsible for the hiring of CCRI personnel.

 The question of qualified immunity raised by Defendant King is a threshold issue that determines his immunity from suit, that is, his ability to avoid a trial altogether, rather than merely his immunity from damages. *See Brewer v. Wilkinson,* 3 F.3d 816, 820 (5th Cir.1993). Qualified immunity shields government officials performing discretionary functions "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). When sued in their individual capacities, governmental employees are entitled to a presumption of qualified immunity from suit. *See Pfannstiel v. City of Marion,* 918 F.2d 1178, 1183 (5th Cir.1990). To overcome this presumption, Plaintiff has the burden to prove that no reasonable, similarly situated official could have considered the conduct of the government officials to be lawful under the circumstances known to him at the time. *See Anderson,* 483 U.S. at 640–41, 107 S.Ct. at 3039–40; *Burns–Toole v. Byrne,* 11 F.3d 1270, 1274 (5th Cir.1994).[21] The reasonableness inquiry of the official's conduct is measured with reference to the law as it existed at the time of the conduct in question. *See King v. Chide,* 974 F.2d 653, 657 (5th Cir. 1992). "If reasonable public officials could differ on the lawfulness of the defendant's actions, the defendant is entitled to qualified immunity." *Pfannstiel,* 918 F.2d at 1183.

 "[T]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Mangieri v. Clifton,* 29 F.3d 1012, 1017 (5th Cir.1994) (quoting *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991)). The Fifth Circuit has developed a two-step process for the examination of a claim of qualified immunity. The first inqui-

---

**21.** Once government officials have asserted qualified immunity and established that the allegedly wrongful acts were undertaken within the scope of their discretionary authority, the burden shifts to the party seeking damages to show that quali-

fied immunity does not bar recovery. *See Todd v. Hawk,* 72 F.3d 443, 446 (5th Cir.1995); *Schultea v. Wood,* 47 F.3d 1427, 1430 (5th Cir.1995); *United States v. Burzynski Cancer Research Institute,* 819 F.2d 1301, 1310 (5th Cir.1987).

ry is whether Plaintiff has alleged a violation of a clearly established constitutional right. *See King,* 974 F.2d at 657; *see also Siegert v. Gilley,* 500 U.S. 226, 231–32, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). The next step is to judge the reasonableness of the alleged behavior. *See King,* 974 F.2d at 657. When the Court has a clear picture of what occurred during an incident giving rise to the qualified immunity defense, the "reasonableness" question becomes one of law. *See Lampkin v. City of Nacogdoches,* 7 F.3d 430, 435 (5th Cir.1993) (acknowledging that qualified immunity *should normally be determined by the Court* ).

 Plaintiffs clearly have a constitutional right to be free from excessive force and unreasonable searches resulting from inadequate training or supervision. *See Baker v. Putnal,* 75 F.3d 190, 199 (5th Cir.1996). To establish liability under § 1983 for failure to train or supervise, Plaintiffs must show that the supervisor failed to supervise or train his subordinate, that a causal connection existed between that failure and the violation of Plaintiffs' rights, and that such failure amounted to deliberate indifference. *See id.* Plaintiffs have offered summary evidence that both the CCRI personnel on hand during the September 18 events and the ERT Team that spearheaded the shakedowns were handicapped by inadequate preparation and supervision. Moreover, the Court is satisfied that the violent and humiliating events of that evening were substantially and causally related to the lack of training and supervision. The crucial issue, then, is whether the training and supervisory failures of Defendant King amounted to deliberate indifference and rose to the level of unreasonableness necessary to overcome qualified immunity. *See Anderson,* 483 U.S. at 640–41, 107 S.Ct. at 3039–40; *Burns–Toole v. Byrne,* 11 F.3d 1270, 1274 (5th Cir.1994).

 Plaintiffs have offered substantial summary evidence of Defendant King's train-

ing and supervisory failures. Neither side disputes that as Sheriff, Defendant King had final authority over the entire Brazoria County Detention Center. Should CCRI personnel prove inadequate in performing their responsibilities as jailers, Defendant King would ultimately be responsible for any consequences. Despite that, Defendant King took no steps to provide any training for CCRI personnel or even to ensure that they were trained prior to the arrival of the first group of CCRI inmates. At his first inkling that CCRI might not be up to the task of settling down a noisy new group of inmates, moreover, Defendant King unhesitatingly authorized the use of the Brazoria County ERT Team. He made this decision, again, without offering any instruction whatsoever on the proper use of the team or the proper coordination of efforts among the team, other Brazoria County personnel, and CCRI officers. The ERT Team, in fact, stood by for hours and ultimately went into action without any instructions as to its objective or the necessities of the situation in the CCRI wing of the detention center. The lack of coordination in the September 18 incident is indicative of a more general failure to prepare for situations calling for cooperation between Brazoria County and CCRI personnel; as Defendant King testified in his deposition, he had held no discussion of any type along those lines. In addition, he neither remained present when the ERT Team was deployed nor delegated his chief deputy, Defendant Wagner, to brief or oversee the team. Considering Plaintiffs' summary evidence on the whole, Defendant King's actions amount to deliberate indifference. The Court concludes that no reasonable law enforcement officer in Defendant King's position could have considered such conduct lawful.[22] This failure on Defendant King's part is only exacerbated by the fact that he viewed the Missouri inmates housed in the CCRI wing of his jail as a source of revenue for Brazoria County. Ac-

---

**22.** The Court also notes that Defendant King's commitment to supervision and training failed to improve after the events of September 18. Among other omissions, Defendant King did not communicate with CCRI regarding the use of force by its personnel, most notably Defendant Wallace, during the incident; he made no effort to ensure that inmate grievances regarding the incident were investigated and responded to; he made no effort to investigate subsequent reports of inmate abuse, most concerning beatings at the hands of Defendant Wallace; he made no effort to monitor and make periodic inspections of the CCRI wing of the detention center.

cordingly, Defendant King is not entitled to qualified immunity on Plaintiffs' allegation of failure to train or supervise under § 1983. Moreover, Plaintiffs' summary evidence establishes a genuine issue of material fact with respect to the issue of deliberate indifference.

■ Defendant King also claims qualified immunity with respect to Plaintiffs' allegation of failure to screen under § 1983. Resolution of this question necessarily involves the Court in a consideration of Defendant King's argument that he bore no responsibility for hiring CCRI personnel. The Court finds Defendant King's argument to that end utterly unconvincing. Plaintiffs have offered evidence that Defendant King interceded in CCRI's hiring process to secure a job for Lieutenant Wallace and at least one other CCRI officer. Moreover, the Court finds Plaintiffs' evidence that Defendant King blocked the hiring of another applicant indicative of a much greater degree of involvement in the hiring process than he professes to have had. In addition, Plaintiffs have pointed the Court's attention to the terms of the contract between Brazoria County and CCRI, which included a term obligating the county, presumably through the offices of Defendant King, to provide CCRI all necessary help in screening applicants. Finally, Defendant King himself testified in his deposition that CCRI hiring decisions were subject to his review and approval. Consequently, the Court concludes that Plaintiff has established a genuine issue of material fact with respect to Defendant King's involvement in the hiring process.

■ Turning to the issue of Defendant King's qualified immunity with respect to Plaintiffs' failure to screen claim, the Court notes that Plaintiffs have alleged the violation of a clear constitutional right. An official may be subject to liability under § 1983 for an employment decision that "reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *See Board of County Comm'rs of Bryan County,* 520 U.S. at ——, 117 S.Ct. at 1392. In Defendant King's case, the decision to "recommend" the hiring of Lieutenant Wallace, a

former Texas Department of Corrections officer who had actually been convicted of beating an inmate in violation of his civil rights, carried a substantial risk that some inmate's right to be free from excessive force would be violated. No reasonable, similarly situated official in Defendant King's position would believe that hiring a man who had been convicted for beating an inmate is an acceptable risk in this context. Accordingly, the Court concludes that Defendant King is not entitled to qualified immunity with respect to Plaintiffs' allegation of failure to screen. Defendant King's Motion for Summary Judgment against Plaintiffs' claims under § 1983 is therefore **DENIED.**

2. *Defendant Wagner is entitled to summary judgment on Plaintiffs' § 1983 claims with respect to the September 18, 1996 incident but not with respect to those violations occurring afterward.*

In a motion substantially similar to that of Defendant King's, Defendant Wagner offers three arguments in support of his motion for summary judgment on Plaintiffs' § 1983 claims. First, he argues that he is entitled to qualified immunity. Second, he argues that Plaintiffs have offered no summary evidence establishing deliberate indifference on his part to the training and supervision of the Brazoria County officers. Finally, he argues that he is not responsible for the hiring of CCRI personnel.

With respect to Defendant Wagner's claim of qualified immunity, the Court has already concluded that Plaintiffs have alleged violations of two clearly established constitutional rights. *See Siegert v. Gilley,* 500 U.S. at 231–32, 111 S.Ct. at 1793. Now the Court must judge the reasonableness of Defendant Wagner's conduct. *See King,* 974 F.2d at 657.

■ As chief deputy under Defendant King, Defendant Wagner bore some of the same supervisory and training responsibilities that the Sheriff bore. Like Defendant King, Defendant Wagner did nothing to ensure that CCRI personnel received adequate training. Moreover, he gave the order putting the ERT Team on standby and, accord-

ing to the testimony of Lieutenant Christopher, authorized the participation of a K–9 unit,[23] all without providing any instruction or guidance or personally participating in the action. These actions and omissions demonstrate a sense of complacence toward important supervisory duties that is profoundly troubling in an official in Defendant Wagner's position. However, they alone do not rise to the level required to overcome his presumption of qualified immunity, as the Court is not convinced that reasonable law enforcement officials would necessarily be of the same mind concerning the lawfulness or unlawfulness of Defendant Wagner's conduct.[24] Unlike Defendant King's conduct, Defendant Wagner's actions with respect to the ERT Team and the K–9 unit, without more evidence, could be perceived as a mere lapse in judgment. Mistaken judgments, even those accompanied by consequences as regrettable as those of September 18, 1996, are nonetheless protected by qualified immunity. *See Mangieri v. Clifton*, 29 F.3d at 1017. Moreover, Plaintiffs have not presented any summary evidence that would support a finding that Defendant Wagner had any control over the screening or hiring of CCRI personnel.

 In regard to the actions of CCRI Lieutenant Wallace over the months following the September 18 incident, however, the Court must arrive at a different conclusion with respect to Defendant Wagner's qualified immunity. As Plaintiffs' summary evidence establishes, Lieutenant Wallace was the source of many inmate grievances over that period, all of which alleged excessive force. Defendant Wagner himself testified that his response upon being told of the numerous excessive force complaints lodged against Lieutenant Wallace was simply to demure that Wallace was CCRI's responsibility rather than his. Defendant Wagner's response is profoundly troubling. Inmates have a clear right under the Eighth Amendment to be free from cruel and unusual punishments. *Hudson v. McMillian*, 503 U.S. at 8–9, 112 S.Ct. at 1000. The concept of what punishments are "cruel and unusual" draws its meaning from "the evolving standards of decency that mark the progress of a maturing society." *Id.* (citations omitted). When prison officials sadistically and arbitrarily employ force to harm inmates, those standards of decency are always violated. *Id.* at 9, 112 S.Ct. at 1000. No reasonable law enforcement official in Defendant Wagner's position, when informed of a pattern of violence such as that perpetrated by Lieutenant Wallace, would conclude that willful ignorance of such reports is lawful. Accordingly, the Court concludes that Defendant Wagner is not entitled to qualified immunity with respect to any beatings sustained by inmates at the hands of Lieutenant Wallace during the period after the September 18 incident. Defendant Wagner's Motion for Summary Judgment against Plaintiffs' claims under § 1983 is therefore **DENIED** in part and **GRANTED** in part.

3. *Defendant Crawford is not entitled to summary judgment on Plaintiffs' § 1983 claims.*

Defendant Crawford, the warden of the CCRI facility, advances two arguments in support of his motion for summary judgment on Plaintiffs' § 1983 claims. First, he argues that as a superior who was not physically involved in the September 18 incident he cannot be held liable under respondeat superior for the § 1983 violations of others. Second, he argues that his conduct did not amount to deliberate indifference.

 As an initial matter, the Court notes that private parties such as Defendant Crawford are subject to liability under § 1983. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 1605–06, 26 L.Ed.2d 142 (1970). To be liable under § 1983, a private actor must have acted un-

---

23. Defendant Wagner has testified that he did not authorize the use of a K–9 unit and was surprised when he learned that it had been present during the incident.

24. The Court is by no means condoning Defendant Wagner's conduct. Plaintiffs have presented substantial evidence of inexcusable conduct on his part, much of it related to attempts to minimize the fallout from public disclosure of the events of September 18. However, Plaintiffs have not offered sufficient evidence of supervisory failures contributing to that incident.

der color of state law. *See* 42 U.S.C. § 1983; *Adickes*, 398 U.S. at 152, 90 S.Ct. at 1605–06. Under the "public function" test, a private person or entity acts under color of state law when it performs a function or power "traditionally exclusively reserved to the State." *See Medina v. O'Neill*, 589 F.Supp. 1028, 1038 (S.D.Tex.1984) (citing *Flagg Brothers v. Brooks*, 436 U.S. 149, 157, 98 S.Ct. 1729, 1734, 56 L.Ed.2d 185 (1978); *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352, 95 S.Ct. 449, 454, 42 L.Ed.2d 477 (1974)). In *Medina v. O'Neill*, the court applied the public function test to hold that a guard at a privately operated Immigration and Naturalization Service Facility in Texas acted under color of law when he shot two inmates. 589 F.Supp. at 1038–39. Applying the public function test to the actions of Defendant CCRI, the Court concludes that this private company was performing a function, the incarceration of inmates, that falls within the exclusive responsibility of the state, and thus was acting under color of state law.[25] With that established, the Court may turn its attention to Defendant Crawford's arguments for summary judgment.

Defendant Crawford argues that Plaintiffs may not seek to establish liability based on a theory of respondeat superior. While that argument is technically correct, Defendant Crawford mischaracterizes the nature of Plaintiffs' allegations. Plaintiffs are alleging actual involvement on the part of Defendant Crawford through his failure to properly screen CCRI applicants, *see Board of County Comm'rs of Bryan County*, 520 U.S. at ——, 117 S.Ct. at 1392, adequately train CCRI personnel, and exercise adequate supervision and control, *see Baker v. Putnal*, 75 F.3d at 199.

 Defendant Crawford further argues that Plaintiffs have not produced summary evidence that he was deliberately indifferent to the screening, hiring, training, or supervision of the personnel under his command. The Court strongly disagrees. Plaintiffs have produced evidence that Defendant

Crawford knew of Lieutenant Wallace's prior conviction when he applied but deliberately chose not to inquire into the specifics of the conviction. Moreover, the Court has already discussed the large volume of evidence indicating the woeful lack of training on the part of the CCRI personnel. In addition, Plaintiffs have produced evidence that Warden Crawford witnessed the events of September 18 but did nothing to stop the officers who were kicking the inmates, forcing them to crawl on the floor, and shouting at them. The Court is convinced that Plaintiffs have introduced a genuine issue of material fact concerning the deliberate indifference shown by Defendant Crawford to the risks posed by the hiring of Lieutenant Wallace, the presence of inadequately trained CCRI personnel, and the shakedown of the CCRI facility. Defendant Crawford's motion for summary judgment with respect to Plaintiffs' § 1983 claims is therefore **DENIED.**

4. *Defendant Christopher is not entitled to summary judgment on Plaintiffs' § 1983 claims.*

Defendant Christopher, a lieutenant with the Brazoria County Sheriff's Office who was in command of the ERT Team during the events of September 18, 1996, offers two arguments in support of his motion for summary judgment on Plaintiffs' § 1983 claims. First, he argues that he is entitled to qualified immunity. Second, he argues that he cannot be held responsible for the actions of the CCRI personnel or the other Brazoria County deputies involved in the shakedown.

 Like Defendant Crawford, Defendant Christopher improperly characterizes Plaintiffs' argument. Plaintiffs do not argue that Defendant Christopher is vicariously liable for the actions of the officers under his command. Rather, Plaintiffs argue that Defendant Christopher violated his affirmative duty to intercede to protect the inmates from the excessive force employed by the other officers. *See Hale*, 45 F.3d at 919. Plaintiffs contend, and this Court agrees, that the duty

---

**25.** Without specifically addressing the question of whether private prison officials can be sued under § 1983, the Supreme Court has held that in such lawsuits, private prison officials are not

entitled to qualified immunity. *See Richardson v. McKnight*, 521 U.S. 399, ——, 117 S.Ct. 2100, 2103, 138 L.Ed.2d 540 (1997).

to intercede is heightened in a prison setting, where the state has restrained an individual's liberty to such a degree that he can no longer care for or protect himself. *See DeShaney v. Winnebago County Social Services Dep't,* 489 U.S. 189, 200, 109 S.Ct. 998, 1005–06, 103 L.Ed.2d 249 (1989); *Estelle v. Gamble,* 429 U.S. 97, 103–04, 97 S.Ct. 285, 290–91, 50 L.Ed.2d 251 (1976). Insofar as Defendant Christopher, as the commanding officer of the ERT Team, bore such an affirmative duty, Plaintiffs have clearly alleged a violation of their correlative right: they have offered evidence that they were kicked, bitten, stunned, intrusively searched, and forced to lie naked on the floor and in their bunks for hours. The question before the Court, then, becomes whether, for purposes of determining Defendant Christopher's entitlement to qualified immunity, a reasonable officer in his position could have considered such a failure to intercede lawful. The Court concludes that no reasonable officer would consider Defendant Christopher's failure lawful. Plaintiffs have offered evidence that Defendant Christopher did nothing to stop Deputy Cisneros from allowing his dog to bite inmates even after he witnessed one such incident. Similarly, Defendant Christopher did not remove Lieutenant Arnold from the scene of the shakedown even after he heard Arnold discharge the stun gun. Defendant Christopher admitted in his deposition that a stun gun is too dangerous to use in a jail setting. From this evidence, the Court concludes that Defendant Christopher is not entitled to qualified immunity. Accordingly, Defendant Christopher's motion for summary judgment on Plaintiffs' § 1983 claims is **DENIED.**

5. *Defendants Cisneros and Arnold are not entitled to summary judgment on Plaintiffs' § 1983 claims.*

 Defendants Cisneros and Arnold, Brazoria County officers who were involved in the September 18 incident, move for summary judgment on the basis that they are entitled to qualified immunity. Plaintiffs allege that Defendant Cisneros, the K–9 handler, allowed his dog to bite as many as five

inmates without provocation. Plaintiffs allege that Defendant Arnold, a lieutenant in the Sheriff's Office, discharged a stun gun against several Plaintiffs that evening, also without provocation. These claims clearly allege violations of Plaintiffs' constitutional right to be free from excessive force in the prison setting. *See Hudson v. McMillian,* 503 U.S. at 8–9, 112 S.Ct. at 1000. However, Defendants Cisneros and Arnold apparently contend that the events of that evening could have led reasonable officers in their position to believe that employing dogs and stun guns against the inmates was reasonable.

The Court's reference to the "apparent" contentions of Defendants Cisneros and Arnold is not gratuitous. The Court can only speculate on what their perceptions of the events of September 18 were as each officer pleaded the Fifth Amendment in his deposition in this matter.[26] When the Court has a clear picture of what occurred during an incident giving rise to a defense of qualified immunity, the "reasonableness" question becomes one of law. *Lampkin,* 7 F.3d at 435. In this case, the officers' objective observations of the facts and circumstances surrounding the incident might deprive the Court of such a clear picture. However, as each has invoked the Fifth Amendment with respect to every single question asked of him by Plaintiffs' counsel and offered the Court nothing more than conclusory affidavits declaring that there actions were "objectively reasonable," the Court must operate within the boundaries of the incident as Plaintiffs have pictured it. *See Javid v. Scott,* 913 F.Supp. 223, 228–29 (S.D.N.Y.1996) ("We will not permit [Defendant] to invoke the Fifth Amendment to shield himself from examination while offering his self-serving statements as the only available evidence relevant to his asserted justification for the use of deadly force.") The issue of Defendants Cisneros and Arnold's entitlement to qualified immunity becomes a question of law. As a matter of law, then, the Court concludes that their actions were not objectively reasonable. Without provocation, Defendant Cisneros allowed his dog to bite as many as five essentially helpless inmates. Similarly, Defendant

---

**26.** Criminal proceedings in this matter are pending.

Arnold discharged a stun gun, a weapon described by Lieutenant Christopher as "serious and incapacitating," against several other inmates. No reasonable law enforcement officer in their position could conclude that such conduct is lawful. Accordingly, Defendants Cisneros and Arnold's motions for summary judgment on Plaintiffs' § 1983 claims are therefore **DENIED**.

6. *Defendant Wallace is not entitled to summary judgment on Plaintiffs' § 1983 claims.*

Defendant Wallace, the CCRI lieutenant, advances several arguments in support of his motion for summary judgment. First, he argues that he cannot be held liable under respondeat superior on Plaintiffs' § 1983 claims. Second, he argues that Plaintiffs have offered no evidence that he was deliberately indifferent to the training and supervision of the CCRI personnel under his command. Finally, he makes specific arguments for summary judgment against three individual plaintiffs. First, he argues that Plaintiff Michael Clemmons has offered no evidence that he caused Plaintiff Clemmons's eye injury. Second, he argues that Plaintiff Vincent Tallie was not even in the CCRI facility on the date on which Plaintiff Tallie alleged he was assaulted. Finally, he argues that Plaintiff Elvis Kelly's only complaint was a short delay in receiving his blood pressure medication and that he played no role in that delay.

As to Defendant Wallace's more general arguments in support of summary judgment, the Court must begin by noting that like Defendants Crawford and Christopher, Defendant Wallace mischaracterizes Plaintiffs' argument. Plaintiffs' contention that Defendant Wallace failed to adequately supervise is not premised on a respondeat superior theory of liability. Rather, failure to supervise under § 1983 is a species of direct liability. *See Baker v. Putnal,* 75 F.3d at 199. Further, the Court finds that like Defendant Christopher, Defendant Wallace had an affirmative duty to intervene as a superior. *See Hale,* 45 F.3d at 919; *see also DeShaney,* 489 U.S. at 200, 109 S.Ct. at 1005–06; *Gamble,* 429 U.S. at 103–04, 97 S.Ct. at 290–91. That

the brutal treatment of the inmates in the CCRI facility continued despite Defendant Wallace's presence is some proof of his non-intervention. The Court concludes that these arguments do not support summary judgment against Plaintiffs' § 1983 claims.

■ Turning to Defendant Wallace's arguments for summary judgment against individual Plaintiff Clemmons, the Court concludes that they do not support summary judgment. Plaintiff Clemmons alleges that he suffered a retina injury at the hands of Defendant Wallace. Defendant Wallace points to an admission by Plaintiff Clemmons that Clemmons was poked in the eye in a game of basketball as support for his argument that he did not cause the injury. As Plaintiff has offered summary evidence that Defendant Wallace's use of force caused his eye injury, the Court finds that this admission goes only to the extent of the injury rather than its existence.

With respect to Defendant Wallace's lone argument in support of summary judgment against the § 1983 claim of Plaintiff Tallie, that Plaintiff Tallie was not at the detention center on October 5, 1996, the date he pled that he was injured by Defendant Wallace, the Court notes that the date pled on the complaint was an error. The correct date of Plaintiff Tallie's alleged injury is December 20, 1996.

Finally, with respect to Defendant Wallace's argument that Plaintiff Kelly's allegation that he did not receive his blood pressure medication on September 18, 1996, does not support a finding of § 1983 liability against Defendant Wallace, the Court notes that Plaintiff Kelly was one of the seventeen inmates who allegedly were abused on that date. Plaintiffs' complaint clearly alleges that harm.

The Court concludes that none of Defendant Wallace's arguments supports summary judgment on Plaintiffs' § 1983 claims. Accordingly, Defendant Wallace's motion for summary judgment with respect to those claims is **DENIED**.

**7. *Defendant Brazoria County is not entitled to summary judgment on Plaintiffs' § 1983 claims.***

Defendant Brazoria County offers three arguments in support of its motion for summary judgment on Plaintiffs' § 1983 claims. At the outset, the Court notes that Defendant Brazoria County's arguments are identical to those offered by Defendant King, the Brazoria County Sheriff. Because the Court has found those arguments unconvincing, and because the actions of Defendant King, as the ultimate decision-maker for Brazoria County with respect to the operation of the Brazoria County Detention Center, are attributable to Brazoria County, *see Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 68, 136 L.Ed.2d 29 (1996); *Turner v. Upton County, Texas*, 915 F.2d 133, 137 (5th Cir.1990), the Court concludes that Defendant Brazoria County is not entitled to summary judgment on Plaintiffs' § 1983 claims. Accordingly, Defendant Brazoria County's motion for summary judgment with respect to those claims is **DENIED**.

**8. *Defendant CCRI is not entitled to summary judgment on Plaintiffs' § 1983 claims.***

In a motion that can best be described as somewhat convoluted, Defendant CCRI moves for summary judgment on Plaintiffs' § 1983 claims. The Court has already noted that Defendant Crawford was acting under color of state law and thus may be held liable under § 1983. *See Medina*, 589 F.Supp. at 1038–39. Insofar as Defendant Crawford, the warden of the CCRI facility, was the ultimate decision-maker for CCRI with respect to the operations it conducted under color of state law at the Brazoria County facility, his actions are attributable to CCRI. *Cf. Brown v. Bryan County, Oklahoma*, 67 F.3d 1174, 1183 (5th Cir.1995) ("[A] single decision may create municipal liability *if* that decision were made by a final policy-maker responsible for that activity.") (emphasis in original), *rev'd on other grounds*, 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). Accordingly, Defendant CCRI's motion for summary judgment with respect to Plaintiffs' claims under § 1983 is **DENIED**.

**B. *Plaintiffs' State Law Intentional Tort Claims***

Plaintiffs allege claims of assault and battery against Defendants Cisneros, Arnold, and Wallace and against Defendants Brazoria County and CCRI through respondeat superior. Plaintiffs also allege claims of intentional infliction of emotional distress against all Defendants. None of the individual Defendants against whom Plaintiffs have alleged claims of assault and battery has moved for summary judgment. Individual Defendants King, Wagner, and Christopher have moved for summary judgment against Plaintiffs' claims of intentional infliction of emotional distress. Defendant Brazoria County moves for summary judgment against all of Plaintiffs' intentional tort claims on the basis of sovereign immunity. Defendant CCRI has not moved for summary judgment on any of Plaintiffs' intentional tort claims.

**1. *Individual Defendants Cisneros, Arnold, and Wallace are not entitled to official immunity with respect to Plaintiffs' intentional tort claims.***

 As an initial matter, the Court notes that individual Defendants Cisneros, Arnold, and Wallace do not argue that they are entitled to official immunity with respect to Plaintiffs' claims of assault and battery and intentional infliction of emotional distress. Under Texas law, official immunity is an affirmative defense. *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex.1994). Consequently, the defendant in a case such as this bears the burden of establishing all the elements of the defense. *Id.* However, Defendants Cisneros, Arnold, and Wallace have not even pleaded official immunity as a defense. Accordingly, the Court must conclude that they are not entitled to official immunity with respect to Plaintiffs' intentional tort claims.

 Even had Defendants Cisneros, Arnold, and Wallace pleaded official immunity as a defense, however, they would not be entitled to its protections. Government em-

ployees are entitled to official immunity from suit arising from the performance of their discretionary duties in good faith so long as they are acting within the scope of their authority. *Id.* As official immunity is an affirmative defense and these Defendants have offered no evidence of their good faith execution of their discretionary duties, the Court could not hold them entitled to official immunity even if the defense had been pleaded.

2. *Defendants King, Wagner, and Christopher are not entitled to summary judgment on Plaintiffs' claims of intentional infliction of emotional distress.*

 Defendants King, Wagner, and Christopher argue simply that their actions cannot as a matter of law constitute intentional infliction of emotional distress. The Court disagrees. Under Texas law, plaintiffs alleging intentional infliction of emotional distress must establish that the defendant acted intentionally or recklessly, that the conduct was "extreme and outrageous," that the conduct caused plaintiffs emotional distress, and that the emotional distress was severe. *Twyman v. Twyman,* 855 S.W.2d 619, 621 (Tex.1993). Plaintiffs have offered sufficient summary evidence on these elements to withstand summary judgment.

 Plaintiffs have produced enough evidence to create a fact issue as to whether the actions of Defendants King, Wagner, and Christopher were both reckless and extreme and outrageous. With respect to Defendant King, Plaintiffs have produced evidence that he encouraged and secured the hiring of Lieutenant Wallace to the CCRI staff despite actual knowledge of Wallace's conviction for the beating of an inmate, that he authorized the use of the ERT Team without providing any instructions, that he failed to coordinate with CCRI staff and officials the manner in which joint operations would be handled, and that he failed to personally oversee the ERT Team in a situation that had violent potential. With respect to Defendant Wagner, Plaintiffs have produced evidence that he, like Defendant King, failed to coordinate the manner in which joint operations between Brazoria County personnel and CCRI would be han-

dled, that he failed to appear in person to oversee the ERT Team on September 18, 1996, and that he failed to take any action with regard to the numerous grievances filed concerning Lieutenant Wallace's use of force against inmates. Finally, with respect to Defendant Christopher, Plaintiffs have offered evidence of the numerous excesses committed by Brazoria County and CCRI personnel on the evening of September 18 and Defendant Christopher's failure to take any action to prevent those excesses. This evidence, coupled with evidence that Plaintiffs were kicked, bitten, shocked, subjected to physically intrusive searches, and forced to lie naked for hours, could support a jury finding that Defendants' conduct was "extreme and outrageous." The Court is mindful that liability for outrageous conduct should be found "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Twyman,* 855 S.W.2d at 621. Indeed, in the past eight years this Court cannot remember a single claim of intentional infliction of emotional distress that it has allowed to go to a jury. However, this case presents a factual scenario this Court has not confronted before. If the facts are as Plaintiffs allege them to be, then the Court cannot recall a series of events as utterly barbaric as those now before it. Accordingly, the motions of Defendants King, Wagner, and Christopher for summary judgment with respect to Plaintiffs' claims for intentional infliction of emotional distress are **DENIED.**

3. *Defendant Brazoria County is entitled to sovereign immunity with respect to Plaintiffs' intentional tort claims.*

 Defendant Brazoria County argues that it is entitled to sovereign immunity with respect to Plaintiffs' intentional tort claims. Governmental units such as Brazoria County retain sovereign immunity from tort suits except those for which immunity has been waived by the Texas Tort Claims Act. The Tort Claims Act waives immunity for three types of claims: (1) claims arising from the operation or use of motor-driven vehicles or

equipment; (2) claims caused by a condition or use of tangible personal or real property; and (3) claims arising from premise defects. *See* Tex.Civ.Prac. & Rem.Code Ann. §§ 101.021(1) and (2), 101.022. Plaintiffs' intentional tort claims, assault and battery and intentional infliction of emotional distress, do not fall within this waiver of immunity. Moreover, the Tort Claims Act's waiver of immunity expressly excludes intentional torts such as assault and battery and intentional infliction of emotional distress. *See* Tex.Civ. Prac. & Rem.Code Ann. § 101.057(2).

Plaintiffs advance a well-reasoned argument, based on the Tort Claims Act's distinction between governmental and proprietary functions for purposes of waiver of immunity, that Defendant Brazoria County should not be entitled to sovereign immunity. Under the Tort Claims Act, municipalities retain immunity, subject to certain limited exceptions, for governmental functions, or those *functions they are compelled to perform.* *See* Tex.Civ.Prac. & Rem.Code Ann. § 101.0215(a). Municipalities do not retain immunity for functions that are proprietary, that is, functions that are discretionary and serve the interests of the inhabitants. *See* Tex.Civ.Prac. & Rem.Code Ann. § 101.0215(b). This distinction is peculiar to municipalities. All actions of county governments, for instance, are presumed to be governmental. *See, e.g., Salcedo v. El Paso Hosp. Dist.,* 659 S.W.2d 30, 31 (Tex.1983); *Armendarez v. Tarrant County Hosp. Dist.,* 781 S.W.2d 301, 303 (Tex.App.—Forth Worth 1989, writ denied). The distinction, Plaintiffs argue, makes little sense, particularly in light of this case, where Defendant Brazoria County entered into the contracts with CCRI and the state of Missouri for purely profit-based motives. In support of their argument, Plaintiffs cite *City of Galveston v. Posnainsky,* the case that introduced the governmental-proprietary distinction in Texas law. 62 Tex. 118 (1884). There, the Texas Supreme Court noted that absolute governmental liability was inappropriate where a municipality exercised "powers intended for the private advantage and benefit of the locality and its inhabitants ..." *Id.* Indeed, the Supreme Court noted, a municipality engaged in such functions should face the same liability a private corporation "ex-

ercising the same powers for a purpose essentially private" would face. *Id.* The same rationale would seem equally applicable where a county entered into a purely profit-motivated venture, as Defendant Brazoria County did, Plaintiffs argue. While the Court recognizes the merit of Plaintiffs' argument, and recognizes the inconsistency of holding Defendant CCRI liable for the same conduct for which Defendant Brazoria County is immune, the Court also recognizes that its authority when considering state law is limited. *See, e.g., Roginsky v. Richardson–Merrell,* 378 F.2d 832, 841 (2d Cir.1967) (noting that the power to engage in "extensive law-making" with respect to state law is one that is entrusted to state legislature and state courts rather than federal courts). While it therefore commends Plaintiffs for their well-crafted argument, it must conclude that Defendant Brazoria County is entitled to sovereign immunity with respect to Plaintiffs' claims of assault and battery and intentional infliction of emotional distress. Accordingly, Defendant Brazoria County's motion for summary judgment on such claims by Plaintiffs is **GRANTED.** Any and all such claims for assault and battery and intentional infliction of emotional distress against Defendant Brazoria County are thus **DISMISSED WITH PREJUDICE.**

### C. *Plaintiffs' State Law Negligence Claims*

Plaintiffs allege claims of negligent hiring, training, and supervision against individual Defendants King, Wagner, and Crawford and Defendants Brazoria County and CCRI. Further, Plaintiffs allege negligent use of personal property against Defendants Brazoria County and CCRI. Only Defendant Brazoria County has presented a discernible motion for summary judgment as to these claims, arguing that it is entitled to sovereign immunity. Defendants King and Wagner appear to reiterate the arguments they offered in support of their motions for summary judgment on Plaintiffs' § 1983 claims.

1. *Defendants King and Wagner are not entitled to summary judgment on Plaintiffs' claims of negligent hiring, training, and supervision.*

Texas law allows recovery for negligent hiring or retention where an em-

ployer knew or should have known through the exercise of reasonable care that an applicant or employee was incompetent or unfit and that his hiring or retention would thereby create an unreasonable risk of harm to others. *See Estate of Arrington v. Fields,* 578 S.W.2d 173, 178 (Tex.Civ.App.—Tyler 1979, writ ref'd n.r.e.). Plaintiffs have alleged that Defendants King and Wagner's actions with respect to hiring, training, and supervising their personnel and those of CCRI constitute negligence under this standard. In support of their allegations, Plaintiffs have produced evidence that Defendant King hired or secured the hiring of Lieutenant Wallace with knowledge of his conviction for the beating of an inmate, that Defendants King and Wagner failed to instruct Brazoria County and CCRI personnel on how to coordinate their actions, that they deployed the ERT Team with no instructions or guidance as to their objectives, and that they ignored repeated complaints about Lieutenant Wallace's violent conduct. Accordingly, the Court concludes that Plaintiffs have offered sufficient evidence to create a fact issue as to Defendants King and Wagner's negligence. Defendants King and Wagner's motion for summary judgment on Plaintiffs' claims for negligent hiring, training, and supervision is therefore **DENIED.**

2. *Defendant Brazoria County is entitled to sovereign immunity with respect to Plaintiffs' claims of negligent hiring, training, and supervision.*

Defendant Brazoria County retains sovereign immunity from suit except to the extent that such immunity has been waived by the Texas Tort Claims Act. The Tort Claims Act waives immunity for three types of claims: (1) claims arising from the operation or use of motor-driven vehicles or equipment; (2) claims caused by a condition or use of tangible personal or real property; and (3) claims arising from premise defects. *See* Tex.Civ. Prac. & Rem.Code Ann. §§ 101.021(1) and

(2), 101.022. Plaintiffs' claims of negligent hiring, training, and supervision do not fall within that limited waiver. Accordingly, the Court holds that Defendant Brazoria County is entitled to sovereign immunity with respect to any and all such claims.[27] Defendant Brazoria County's motion for summary judgment on Plaintiffs' claims of negligent hiring, training, and supervision is hereby **GRANTED.** Plaintiffs' claims for negligent hiring, training, and supervision against Defendant Brazoria County are therefore **DISMISSED WITH PREJUDICE.**

## IV. CONCLUSION

The Court understands that overseeing and working within a jail or prison environment is a difficult task. Jails and prisons are by their very nature involuntary destinations for "persons who have a demonstrated proclivity for anti-social, and often violent, conduct." *Hudson v. Palmer,* 468 U.S. 517, 526, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984). Nevertheless, jail and prison officials bear the difficult burden of balancing the requirements imposed by the nature of their charges against rights those prisoners do not forfeit simply because they have been adjudicated guilty of some crime. Administrators must ensure the safety of their staffs, visitors, the public, and the inmates themselves. *See id.* at 527, 104 S.Ct. at 3200. This last duty requires officials to stay alert for the presence of drugs, weapons, and other contraband. *Id.* Efforts to safeguard the wellbeing of inmates where the presence of such contraband is suspected pose perhaps the greatest challenge to the balancing task officials must perform.

The injection of profit-seeking into the prison environment complicates this inherent difficulty. Ensuring the safety of inmates and personnel while respecting the essential rights of the inmates is difficult for experienced, skilled, and conscientious officers and

---

**27.** The Court notes that Defendant Brazoria County has not attempted to assert sovereign immunity with respect to Plaintiffs' claims of negligent use of personal property. As this claim falls squarely within one of the Tort Claims Act's waivers of immunity, *see* Tex.Civ.Prac. & Rem. Code § 101.021(2), Defendant Brazoria County

would not be entitled to sovereign immunity on this claim even if it had asserted the defense. Summary judgment dismissal of Plaintiffs' claims against Defendant Brazoria County for negligent hiring, training, and supervision thus should be read as having no bearing on Plaintiffs' claim for negligent use of personal property.

administrators. Unfortunately, many factors may combine to drain those qualities out of the available pool from which private prison companies draw their personnel. Although such corporations potentially could help alleviate the very real problems of overcrowding in the federal and state prison systems, they are still in the business of making a profit. Experience, training, and temperament may become expendable virtues when their associated costs threaten the bottom line.[28] The undisputed actions of CCRI, unfortunately, have done little to assuage the Court's misgivings about the privatization of prisons. Given the opportunity to build a staff from the ground up, CCRI chose to hire a collection of individuals with almost no experience in correctional work. Of course, perhaps CCRI would have been better off had it compiled a staff with no experience whatsoever. Of the three individuals that to this Court's knowledge had prior correctional experience at the time of hiring, two turned out to be convicted criminals themselves, each in fact convicted for conduct similar to that which forms the basis of this lawsuit.

Where the actions of CCRI have to some degree affirmed the Court's misgivings, however, the actions of the Brazoria County Defendants have been an appalling disappointment. The Brazoria County personnel had the experience and skill that the CCRI staff lacked, yet their involvement in the events of September 18, 1996, was just as brutal. Most atrocious of all was the attitude of the top officials in the Brazoria County Sheriff's Office, notably Defendant King. Defendant King, while apparently aware of the problems in the CCRI wing of his facility, viewed them as solely within the domain of CCRI. This attitude is particularly troubling given his view of the contracts with CCRI and the state of Missouri as big "money-makers" and the inmates to be housed in his facility as commodities.

Plaintiffs have produced evidence that they were kicked, bitten, and shocked. They have produced evidence that they were forced to strip naked in groups and subjected to full cavity searches, many of them conducted in full view by prison staff with absolutely no training or experience in executing such searches. They have produced evidence that at least a dozen inmates suffered vicious and unprovoked beatings at the hand of CCRI personnel and that grievances filed in every single instance with Brazoria County officials produced no response. Evidence such as this paints a grim picture of the actions of Defendants. If Defendant Brazoria County and its officials choose to farm out a portion of their jail to some quack private prison corporation in return for substantial profits for housing another state's inmates, that is a matter between them and their citizens. If, however, there is evidence that those Defendants have utterly abandoned their duty to safeguard the essential human rights of these inmate commodities, that is a matter between them and this United States District Court.

The Court finds that Plaintiffs have produced sufficient summary evidence to overcome the qualified immunity of Defendant King with respect to Plaintiffs' claims of failure to screen and failure to train or supervise under § 1983. The Court finds that Plaintiffs have not produced sufficient summary evidence to overcome the qualified immunity of Defendant Wagner with respect to Plaintiffs' § 1983 claims of failure to screen and failure to train or supervise with respect to

28. The Court recognizes, of course, that starting from the obvious premise that lowering costs is economically desirable does not automatically mean that private prison companies will in fact look to prior experience and training as areas in which to focus cost-saving measures. Indeed, one could arrive at the opposite conclusion: These corporations could conclude that a potentially greater source of unnecessary expense is the cost of defending or even losing civil rights lawsuits and that greater experience and more extensive training for personnel reduces those costs. That was Justice Scalia's observation in *Richardson v. McKnight*, 521 U.S. at ——, 117 S.Ct. at 2111 (Scalia, J., dissenting). However, that argument requires the assumption that the relevant decision-makers are sovereign maximizers, that is, decision-makers who seek to make the decisions that will most benefit them and possess the information necessary to do that. Whether such an assumption is a generally, empirically valid one the Court cannot with absolute certainty say; however, the actions of Defendant CCRI in hiring staff with no experience and providing no training tend to belie at least the assumption that such decision-makers will always succeed in making the correct decisions.

the incidents of September 18, 1996. However, Plaintiffs have produced sufficient summary evidence to overcome Defendant Wagner's qualified immunity on Plaintiffs' § 1983 claim of failure to train or supervise with respect to the actions of Lieutenant Wallace against several Plaintiffs. The Court also finds that Plaintiffs have produced sufficient summary evidence to overcome Defendant Christopher's qualified immunity with respect to Plaintiffs' § 1983 claim for failure to intervene. Finally, the Court finds that Plaintiffs have produced sufficient evidence to overcome the qualified immunity of Defendants Cisneros and Arnold with respect to Plaintiffs' § 1983 claims of excessive force.

The Court finds that Plaintiffs have produced sufficient evidence to withstand summary judgment on all of Plaintiffs' § 1983 claims against Defendants Brazoria County, CCRI, Crawford, and Wallace. Moreover, the Court finds that Plaintiffs have produced sufficient evidence to withstand summary judgment on Plaintiffs' state law intentional tort claims against Defendants King, Wagner, Christopher, Cisneros, and Arnold; and Plaintiffs' state law negligence claims against Defendants King and Wagner. However, the Court finds that Defendant Brazoria County is entitled to sovereign immunity with respect to Plaintiffs' state law intentional tort and negligence claims.

These remaining claims will be set for trial at a later date. Without commenting on the merits of the claims or the defenses asserted, the Court will examine them again at that time.

For the reasons set forth above, Plaintiffs' claims for § 1983 failure to screen and failure to train or supervise against Defendant Wagner are **DISMISSED WITH PREJUDICE** with respect to those Plaintiffs alleging claims relating solely to the events of September 18, 1996. In addition, Plaintiffs' claims against Defendant Brazoria County for assault and battery, intentional infliction of emotional distress, and negligent hiring, training, and supervision are **DISMISSED WITH PREJUDICE**. The parties are **ORDERED** to bear their own taxable costs and expenses incurred herein to date. In due

course, the Court will enter a Final Judgment on all claims dismissed herein.

**IT IS SO ORDERED.**